[Civ. No. 16341.   Second Dist., Div. Three.   Dec. 3, 1948.]

J. G. MOSER, Respondent, v. WESTERN HARNESS RACING ASSOCIATION (a Corporation), Appellant.

Oliver B. Schwab and Arthur Livingston for Appellant.

Leonard Wilson and Arnold L. Leader for Respondent.

SHINN, P. J.—Plaintiff recovered a judgment against Western Harness Racing Association, a corporation, for legal services rendered as general counsel of the corporation under a written contract of employment. The court found that defendant employed plaintiff for one year from October 19, 1945, at an annual retaining fee of $12,000, payable $1,000 per month; that plaintiff accepted said employment and rendered services as agreed until on or about May 27, 1946, at which time he was, without cause or provocation, discharged as general counsel; and that he had been paid only $6,500. Judgment was rendered in plaintiff's favor for the sum of $7,156.19.

Defendant, by its answer alleged that plaintiff was discharged for good and sufficient cause. As justification for terminating the employment, the answer specified the following particulars in which it was claimed that plaintiff failed to render competent and faithful service: (1) "Plaintiff wrongly and negligently advised Defendant that it was not legally obligated to issue ten (10) shares of its stock to one Mel E. Rogers"; (2) that "Plaintiff wrongly and negligently advised Defendant to refuse to issue its stock to said Rogers on the further ground that said Rogers had issued a bad check to a third person" etc.; (3) that plaintiff submitted to the Corporation Commissioner an application for a permit to issue stock which contained a false statement; (4) that he negligently failed to take the necessary steps to accomplish the release of one Harry J. Dornan from a subscription agreement; (5) that plaintiff attempted to purchase from Dornan his rights to 20 shares of stock without disclosing his said attempt to defendant; (6) that plaintiff prepared minutes of the corporation showing his employment for one year, when in fact the board of directors had resolved to employ him only until August 1, 1946; (7) that plaintiff arranged with an advertising agency that he would receive a percentage of

profits made by the agency in the handling of defendant's account, and concealed the fact of said arrangement from defendant's board of directors. In addition to finding that the allegations of the complaint were true, the court found specifically that the foregoing charges of neglect and breach of duty were, and that each of them was, untrue. The grounds of appeal are that the findings are not supported by the evidence, that the court erred in the exclusion of offered evidence, and that even though plaintiff had been discharged without cause he was entitled to compensation only up to the time of his discharge.

Defendant corporation was formed September 18, 1945. Prior to that time plaintiff had prepared for the interested parties a preorganization subscription agreement by which plaintiff subscribed for 20 shares, M. E. Rogers for 10 shares, one Harry J. Dornan for 20 shares, and others for 300 shares, all at $1,000 per share. The agreement read in part, as follows: "September 10, 1945. To: Western Harness Racing Association: I hereby request that application be made in my name for the issuance to me of stock in the Western Harness Racing Association, a corporation to be organized under laws of California, at the rate of One Thousand ($1,000.00) Dollars per share, in the amount set opposite my name hereafter, and agree that if, as and when the Commissioner of Corporations of the State of California shall issue a permit granting the right to sell such stock, that I will purchase same in such amount" (followed by a list of subscribers and the amounts of money subscribed). The corporation was duly organized, directors and officers were elected, and at a meeting held September 24, 1945, the board of directors adopted a resolution authorizing an application to the Corporation Commissioner for issuance of 350 shares of stock in accordance with the subscription agreement.

Prior to October 4th, M. E. Rogers had issued a check for $237 to Walter E. Smith, one of the directors, which had been endorsed by Smith and had been cashed at the restaurant of one Tom Breneman, who was a client of plaintiff and a business associate of Smith. Payment of the check was refused by the bank for insufficiency of funds. Breneman reported the matter to plaintiff, who interviewed Rogers and was told that he, Rogers, did not have money in bank to cover the check. His explanation of the reason for this will be referred to later. Rogers refused to make the check good, insisting that Smith was indebted to him and should pay the

amount. Smith, while denying any indebtedness to Rogers, did redeem the check from Breneman. At a meeting of the directors on October 4th, and because of prior discussions to the effect that they did not wish to include anyone in their plans who would be unable to pay for his stock when it was issued, plaintiff disclosed some, but not all, of the facts of the Rogers check transaction. From the record it appears that plaintiff told the directors that Rogers had stated to him "that he did not have money to cover the check." Plaintiff discussed the matter with the directors and raised the question whether Rogers would be able to pay for his stock. He was questioned by the directors as to whether Rogers had a valid and enforcible subscription for stock in the corporation and advised them that it was no more than an offer to purchase stock, which need not be accepted by the corporation. Notwithstanding the action that had been taken by them at the September 24th meeting, the board of directors, acting upon the advice of plaintiff, adopted a resolution accepting all the subscriptions save that of Rogers, and allocating the 10 shares for which Rogers had subscribed to subscribers Breneman and Autry, in equal amounts. Plaintiff then drew a line through the signature of Rogers on the original subscription agreement and made a notation on the margin, "by order of majority precorp. 10-4-45."

Plaintiff testified that the foregoing discussion took place without his identifying Rogers as the one who had issued the check, but that Rogers' name was disclosed on the following day after it had been stricken from the agreement.

The resolution which had been adopted on September 24th read, in part, as follows: "RESOLVED: That the president and/or secretary of this corporation be, and he hereby is authorized and directed to prepare or cause to be prepared, verify and file, or cause to be filed, on behalf of this corporation, an application to the Commissioner of Corporations of the State of California for a permit authorizing this corporation to sell and issue shares of its capital stock as follows: (1) To sell and issue to the individuals hereinafter named, an aggregate of not to exceed 350 shares of its capital stock at and for the price of $1000.00 per share, for cash, lawful money of the United States, for the use and purposes set forth in said application and in its Articles of Incorporation." (Here followed a complete list of subscribers, including Rogers, with the amounts subscribed set opposite the respective names.) The subsequent resolution of October 4th by which it was

attempted to reject the subscription of Rogers read, in part, "RESOLVED: That this corporation accept all of the offers of subscription, as set forth in the pre-incorporation subscription, save and except that certain subscription of M. E. Rogers, in the amount of $10,000.00, and as to such subscription, the same shall not be accepted, and the secretary is herewith authorized to strike his name and the amount of his subscription from said pre-incorporation subscription list," etc. By the same resolution the officers were instructed to apply for a permit according to the resolution adopted "at the meeting on the 22nd day of September, 1945 [sic], with the alterations set forth in this resolution."

On October 5th plaintiff, acting as defendant's attorney, filed with the Corporation Commissioner an application for the issuance of stock, to which was attached what purported to be a copy of the minutes of the meeting of September 24th relating to the issuance of stock, which minutes incorporated a list of the original subscribers and the amounts subscribed by each. The copy filed with the commissioner did not contain the name of Rogers, and it showed Breneman and Autry as subscribers for 10 shares each, whereas upon the original agreement and in the list contained in the September 24th minutes they appeared as subscribers for only five shares each. It was not stated in the application that Rogers had ever subscribed for stock, or that an attempt had been made to cancel his subscription in the manner we have stated. Although the application also contained a purported copy of the subscription agreement, it likewise was not a true copy for the reason it did not contain the name of Rogers or show the alteration that had been made in the original. Plaintiff did not file with the application a copy of the minutes of October 4th, nor a copy of the resolution adopted at that time which purported to reject the Rogers subscription. The permit as granted did not authorize the issuance of any stock to Rogers.

As attorney for defendant, Moser also became involved in a controversy which arose with Dornan respecting his subscription. As we have seen, Dornan originally subscribed for 20 shares for $20,000. Later, without his consent, but presumably by action of his associates, a line was drawn through this figure on the agreement and "$10,000" was substituted. Other subscriptions were correspondingly increased by altering the figures on the agreement. On October 2, Dornan wrote the directors requesting the cancellation of

his subscription; plaintiff answered the letter stating that the request would be placed before the board for action; a managing committee of the directors informally accepted Dornan's offer and plaintiff was instructed to that effect and directed to handle the matter; plaintiff testified that he orally notified Dornan that the subscription would be cancelled; Dornan testified to the contrary. However, the minutes of the board show that when plaintiff was criticized by the directors for not giving Dornan written acceptance of his offer to cancel the subscription, he admitted that the matter had "slipped his mind." Dornan later demanded 20 shares of stock for $20,000. Ten of the shares had been allocated to others. Dornan's claim for 20 shares was compromised. The corporate minutes show that the officers were authorized to apply to the Commissioner of Corporations for permission to issue additional shares in connection with settlements which it was found necessary to make with Rogers and Dornan. It also appears that it became necessary in connection with the Rogers and Dornan subscriptions to obtain a waiver from the stockholders of preemptive rights with respect to the isuance of shares in excess of 350. Plaintiff testified that in his conversation with Dornan in which the subscription was discussed he offered to buy the Dornan shares for more than the subscription price but that Dornan refused to sell.

The facts which we have related bring into focus two rules of law which apply to the matter of the termination of an attorney's employment contract. ■ The first of these rules is that an attorney, by accepting employment to give legal advice or to render other legal services, impliedly agrees to use ordinary judgment, care, skill and diligence in the performance of the tasks which he undertakes (*Gambert* v. *Hart*, 44 Cal. 542, 552; *Armstrong* v. *Adams*, 102 Cal.App. 677, 684 [283 P. 871]; *Drais* v. *Hogan*, 50 Cal. 121, 128; *Estate of Kruger*, 130 Cal. 621, 626 [63 P. 31]; *Lally* v. *Kuster*, 177 Cal. 783, 786 [171 P. 761]; *Salopek* v. *Schoemann*, 20 Cal.2d 150 [124 P.2d 21]), and that failure to use such care and skill constitutes a breach of the agreement and' furnishes cause for the attorney's discharge. We are thus led to a consideration of the question whether, upon the undisputed facts, the conclusion of the trial court that plaintiff had not failed to use the requisite care and skill has support in the evidence.

■ The second rule is that irrespective of any question of negligence the client is justified in discharging his attorney

if the latter has given reasonable cause for loss of confidence in his ability or integrity. Mr. Thornton, in his work on "Attorneys at Law," page 239, says: "As to what constitutes a sufficient cause for the discharge of an attorney by his client, although no hard and fast rule can be laid down, it may be said generally that, the relation of attorney and client being one of mutual trust, confidence, and good will, any conduct on the part of the attorney which must necessarily put an end to these justifies the client in terminating the relation." The Court of Appeals of Kentucky, in the case of *Henry* v. *Vance,* 111 Ky. 72 [63 S.W. 273, 276], states: "The relationship of attorney and client is so peculiarly one of confidence and reliance that it would not do to require a party to continue in his service one whom he distrusts, or whose capacity he no longer believes in, or to permit the attorney, under such circumstances, to continue the relationship, where the lack of confidence would seriously impair his efficiency, and interfere with his full opportunity to serve the party and the court as his office requires." We find the principle stated in *Salopek* v. *Schoemann, supra,* 20 Cal.2d 150, 155, as follows: "If an attorney misstates the legal effect of facts or of procedure to his client either through ignorance, carelessness or by mistake, and by his advice indicates and then pursues a course of action which would lead unquestionably to results contrary to the client's declared and proper objectives, the client is not bound to continue the attorney's employment." The general rule was also stated by the court in *Gage* v. *Atwater,* 136 Cal. 170, 172 [68 P. 581], as follows: "The relation between them is such that the client is justified in seeking to dissolve that relation whenever he ceases to have absolute confidence in either the integrity or the judgment or the capacity of the attorney." In stating the rule as applicable to the present facts, we are fully aware that the dissatisfaction which will justify termination of an attorney's employment, as for cause, must be based upon reasonable grounds and not the mere whim of the client or a critical and unreasonable attitude, with which attorneys frequently have to contend. ■ Conduct of the attorney which does not furnish substantial grounds for distrust or lack of confidence will not absolve the client from liability for a wrongful termination of the employment. (*Zurich G. A. & L. Ins. Co., Ltd.* v. *Kinsler,* 12 Cal.2d 98 [81 P.2d 913].)

Our inquiry is directed first to whether plaintiff's advice that Rogers did not have a binding subscription for stock was

given in the exercise of due skill and care in view of the fact that the advice was sought as a guide to action which the corporation was about to take. ■ The facts upon which the advice was sought were clearly established and plaintiff was asked to give his opinion solely upon a point of law. The conclusion of the trial court that plaintiff, in giving this advice, exercised due care and skill involved no decision of fact, and as the question is presented here it is purely one of law. Plaintiff's advice dealt with no abstruse or difficult problem, and the applicable legal principles involved are elementary. The validity of preorganization subscription agreements conforming to statutory regulations is universally recognized, and with but slight research a wealth of authority on the subject is readily available. ■ The following principles are thoroughly established: (1) Ordinarily, a subscription may be withdrawn at any time before the proposed corporation is formed; (2) in California the subscription becomes binding upon the subscriber and the corporation when the corporation is formed, in the absence of special circumstances or an agreement to the contrary; (3) if, under the circumstances of the particular case there is an implied or express agreement for withdrawal of the subscription prior to acceptance of the same by the corporation, action by the corporation approving the subscription will be deemed an acceptance, and the subscription will thereupon become binding upon the subscriber and the corporation. (See, however, later references to the Corporate Securities Act [Stats. 1917, p. 673; 2 Deering's Gen. Laws, Act 3814].)

California Jurisprudence is a handy reference work commonly used by attorneys in legal research. In volume 6A, page 436, is found the following statement of the law: "If the agreement be to form a corporation and take a specified number of shares therein, it is executory; but when the promoters meet and organize the corporation for the objects and as specified in the agreement, and in the articles name the parties with the shares subscribed by each, it is an acceptance by the corporation of such parties as stockholders, and they become bound as such. Under the present law the articles do not name the subscribers but the principle is the same." This summary is supported by numerous decisions, and it states the principles which plaintiff was bound to know, or, if necessary, to investigate, in order to give sound advice to the directors. (*Christian College* v. *Hendley,* 49 Cal. 347, 350; *Marysville etc. Co.* v. *Johnson,* 93 Cal. 538, 547 [29

P. 126, 27 Am.St.Rep. 215]; *San Joaquin L. & W. Co.* v. *West,* 94 Cal. 399, 402 [29 P. 785]; *San Joaquin L. & W. Co.* v. *Beecher,* 101 Cal. 70, 79 [35 P. 349]. Cf., *Marysville E. L. & P. Co.* v. *Johnson,* 109 Cal. 192 [41 P. 1016, 50 Am.St.Rep. 34].) Although the law of California was controlling, the same rules will be found in the case law of other jurisdictions and in the leading treatises on corporations. (See the many cases collected in note to *Coleman Hotel Co.* v. *Crawford,* [(Tex. Com. App.), 3 S.W.2d 1109] 61 A.L.R. 1459, commencing at 1463; see also 13 Am.Jur. § 226, p. 332 et seq.; 18 C.J.S. § 294, p. 777; 1 Cook on Corporations § 75, p. 382; 1 Thompson on Corporations §§ 595-596, pp. 835-838; 4 Fletcher, Cyclopedia of the Law of Private Corporations § 1428, p. 95.)

Preincorporation subscriptions are permitted in California but of course must conform to the statutory law. Section 33 of the Corporate Securities Act (2 Deering's Gen. Laws [Investment Companies], Act 3814), declares that such subscriptions shall be deemed to have been made upon the condition that the corporation be incorporated within 90 days and use reasonable diligence to secure a permit to issue its shares. This same condition is found here in the subscription agreement, but the fact that the agreement to pay for the shares was conditional did not affect the validity or binding force of the subscription, since the conditions were fully met. (*San Joaquin L. & W. Co.* v. *West, supra,* 94 Cal. 399, 402; *Rossi* v. *Jedlick,* 115 Cal.App. 230, 234 [1 P.2d 1065].) ▪ An offer to purchase stock and to accept and pay for it upon specified conditions becomes binding upon the parties when it is accepted by the corporation, and the subscriber can thereafter withdraw only upon the failure of the corporation to meet the conditions. The corporation assumes the duty of prosecuting diligently an application for the issuance of stock to meet its obligation to the subscriber. It is bound equally with the subscriber to render full performance under the subscription agreement. The law is not only clear and well established, but there is no conflict of authority on the subject. At least we have found none, and no case has been cited by respondent as support for the statement in his brief that, as of October 4th, "such subscription constituted nothing but an offer which might be refused." ▪ It is perfectly clear that the corporation had accepted the Rogers subscription by the resolution adopted on September 24th, and could not shed its obligation to him by the mere passage of a resolution purporting to

do so, nor by the idle act of striking his name from the subscription list. It necessarily follows that plaintiff's advice was unsound and was not given in the exercise of ordinary skill or care.

The next question is whether plaintiff used ordinarily good judgment in the proceedings taken before the Commissioner of Corporations. There was a clear failure to conform to the requirements of section 3, subsection (n) of the Corporate Securities Act (2 Deering's Gen. Laws, Act 3814), that all minutes relating to the proposed issuance of securities accompany the application. The permit that was issued conformed to the subscription list as altered, with the result that the corporation was then under contract to issue 360 shares, although it had a permit to issue only 350. As we shall point out, the improper handling of this matter resulted in litigation against the corporation. There was manifest in the proceedings before the commissioner an undeniable want of skill, care and judgment.

The third question is whether defendant had sufficient cause for a loss of confidence in plaintiff's ability and discretion in handling its legal affairs. This question relates to the one of negligence previously discussed and it also brings in question plaintiff's failure to make a full disclosure to the directors of the facts known to him concerning the Rogers check and plaintiff's representation that Rogers had admitted his inability to make the check good. It is clear from the record that plaintiff caused his associates to believe that Rogers had issued a check for $237 without having money in bank to meet it, or the ability to make the check good. Plaintiff's associates had no other knowledge or information on the subject. Plaintiff's own testimony, however, discloses that Rogers had not stated or admitted that he was unable to pay the amount of the check. He had stated only that his brother, with whom he had a joint account, had drawn the balance from the bank without his knowledge, and that he would not pay Smith the amount of the check for the reason that he claimed Smith was indebted to him. The facts respecting this claimed indebtedness had been discussed by plaintiff with Rogers and Smith prior to the October 4th meeting, at which discussion plaintiff apparently supported the position taken by Smith, who denied any indebtedness to Rogers. Plaintiff therefore knew full well that Rogers' failure to pay Smith the $237 was not due to a claimed inability to pay it, but solely to Rogers' intention to credit the

amount upon his claim against Smith. All of plaintiff's information with respect to this dispute was withheld from his associates. Rogers, although unnamed at the time, was portrayed as an insolvent person who would not hesitate to perpetrate a fraud through the issuance of a worthless check. Plaintiff allowed the directors to cancel the Rogers subscription on the basis of an alleged admission of insolvency by Rogers, whereas if he had disclosed the circumstances admittedly known to him, his associates would probably not have attributed to Rogers any dishonest purpose, or any inability to pay for his stock. Having disclosed a part of the facts, for the evident purpose of inducing the directors to cancel the Rogers subscription, plaintiff concealed others which it was his duty to disclose, and thereby induced the corporation to take action that was not sustainable legally. As a result the corporation was subsequently made defendant in a suit by Rogers to compel performance of the subscription agreement, and being advised that it had no valid defense to the action, was required to compromise with Rogers. The compromise came following a partial trial of the action and after the court had announced that it would require the Commissioner of Corporations and all of the stockholders of defendant corporation to be made parties defendant. The court's proposed order in this action obviously arose from plaintiff's failure to file with the Corporation Commissioner a true copy of the original subscription agreement, naming Rogers as one of the subscribers, and from the other deficiencies in the application previously noted.

Plantiff contends that the advice which he gave in connection with the cancellation of Rogers' subscription was proper, and afforded no justification for his discharge, for the reason that even if the Rogers subscription had been accepted by the corporation insolvency of Rogers would have furnished good cause for withdrawal of the acceptance since insolvency would have constituted an anticipatory breach of the agreement to buy the stock. Although we do not agree with this legal proposition (see 17 C.J.S. 972 and 12 Am.Jur. 971), we do not decide the point for the reason that there was no evidence of insolvency. The basis of the argument is that the directors were told by plaintiff that Rogers had admitted that he was unable to make good his check for $237, to which we have referred previously, that the directors accepted this statement as evidence of Rogers' insolvency and cancelled the subscription because they believed that Rogers could not pay

for his stock. This line of argument is unsound. It appeared from plaintiff's own testimony that Rogers had made no such admission. There was no evidence that the directors had any knowledge or information on the subject, other than that furnished by plaintiff, and this, as we have seen, was incomplete and misleading. We may add that Rogers' testimony at the trial that he had ability to pay for the stock was undisputed. Furthermore, we do not find that plaintiff ever advised the board that the insolvency of Rogers would justify cancellation of his subscription. The only advice he gave was that the subscription was a mere offer that need not be accepted, and this was the only ground upon which the subscription was cancelled. The check transaction appears to have been regarded merely as an excuse for action which the directors believe could be taken at their pleasure. It is quite probable that if plaintiff had told the directors all he knew of Rogers' reason for not paying Smith the amount of the check they would not have concluded that Rogers was an undesirable associate who was unable to pay for his stock, and would not have attempted to cancel his subscription. Manifestly, there was just cause for criticism of plaintiff's actions in respect to the Rogers controversy.

It is equally clear that plaintiff's failure to protect the interests of the corporation in the matter of Dornan's offer to rescind his subscription agreement evidenced a want of diligence which would reasonably have tended to shake confidence in his efficiency. All of the matters we have discussed related to the failure of plaintiff to render satisfactory services. In view of the difficulties encountered by defendant as a result of the handling of its legal affairs the termination of plaintiff's employment constituted sufficient evidence of loss of confidence in plaintiff's legal ability. Plaintiff's discharge was clearly based upon sufficient legal grounds.

We find it unnecessary to discuss at length the other specific charges set forth in defendant's answer, but we shall refer to them briefly. The record does not support defendant's assertion that plaintiff, without a full disclosure of his relationship, represented both Smith and defendant where their interests were in conflict. There was no conflict of interests whatever and no impropriety in plaintiff's conduct.

There was evidence that in negotiating a contract with one Peterson for handling defendant's advertising, Smith, Moser and one Davies, who was not a director, proposed to Peterson that they contribute to the financing of his advertising agency,

each of the four to hold a one-fourth interest therein, and that Peterson agreed to the proposal. It was undisputed, however, that immediately thereafter plaintiff informed Smith that he considered the arrangement to be undesirable, and that the three then withdrew their offer to Peterson and the latter alone entered into an agreement with defendant. It does not appear in the record that the directors, other than Smith, had become aware of these negotiations prior to the time of plaintiff's discharge. Defendant's criticism of plaintiff's conduct in this matter assumes that plaintiff, Smith and Davies, intended to profit from the handling of defendant's advertising without a full disclosure of the facts to the directors. This is an unwarranted assumption. There would have been nothing wrong with the arrangement if the directors had been fully informed concerning it, and had in good faith approved it. The presumption of honest dealing warranted the trial court in concluding that the interested parties intended to deal openly and fairly with the corporation. Defendant's criticism of plaintiff's conduct in this particular is unjustified. Likewise without foundation is the claim made in defendant's answer that plaintiff prepared incorrect minutes of directors' meetings.

Defendant's point that even if plaintiff was wrongfully discharged he was entitled to receive only the reasonable value of his services to the time of his discharge is one which we need not consider. There are no other points which require discussion.

Plaintiff is entitled to compensation at the contract rate only up to the time of his discharge, May 27, 1946. The judgment is reversed for further proceedings consistent with the views herein expressed.

Vallée, J., concurred.

Wood, J., concurred in the judgment.

A petition for a rehearing was denied December 31, 1948, and respondent's petition for a hearing by the Supreme Court was denied January 31, 1949. Carter, J., and Schauer, J., voted for a hearing.