Anthony THEOPHILOS; Patricia
A. Theophilos, Petitioners–
Appellants,

v.

COMMISSIONER INTERNAL
REVENUE SERVICE,
Respondent–Áppellee.

No. 94–70634.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 9, 1996.

Decided May 31, 1996.

Lawrence B. Silver, Greene, Radovsky, Maloney & Share, San Francisco, California, for petitioners-appellants.

Bruce R. Ellisen, Tax Division, United States Department of Justice, Washington, DC, for respondent-appellee.

Before: LAY,* CHOY and PREGERSON, Circuit Judges.

LAY, Circuit Judge:

This appeal is from a deficiency judgment rendered by the Tax Court. The Tax Court found that when the taxpayer[1] acquired stock in a closely held corporation on December 10, 1986, he incurred taxable income for the excess of the fair market value of the property over the amount paid for the property under § 83(a) of the Internal Revenue Code.[2] *See Theophilos v. Commissioner,* 67

---

* Honorable Donald P. Lay, Circuit Judge for the Eighth Circuit, sitting by designation.

1. The parties are Anthony and Patricia Theophilos, but the operative facts of this case involve only Anthony Theophilos (the taxpayer). Patricia Theophilos is a party because she filed a joint tax return with Anthony Theophilos for the years in question.

2. Section 83(a) of the Internal Revenue Code provides:

   (a) **General rule.**—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

   (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

   (2) the amount (if any) paid for such property,

   shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the

T.C.M. (CCH) 2106, 1994 WL 31445 (1994). The taxpayer does not dispute he received property from his employer under § 83(a), but asserts he possessed a contract to acquire the stock in 1985 when he agreed to resign from his law firm to join Greater Suburban Mortgage (GSM), a California corporation engaged in the mortgage banking business. At that time, the taxpayer contends, he agreed to pay full value for the stock and, as a result, did not incur any taxable income under § 83(a). The Commissioner argues the taxpayer did not pay full value for the stock and that all he acquired before December 10, 1986, was an option to purchase stock which is expressly not covered as a transfer of property under § 83(e)(3).[3] The Tax Court found the taxpayer had entered into an executory contract containing conditions yet to be performed. On this basis, the Tax Court found that the taxpayer did not acquire the stock until December 10, 1986, when the taxpayer received 1,020 shares of GSM's Class B common stock, which was valued at $2,366,479; that taxpayer had paid only $10,000 for the stock; and that, therefore, he had a deficiency in income tax to be assessed in the amount of $1,185,415 for the taxable year of 1986 and $2,446 for the taxable year of 1987. The taxpayer appeals. We find the taxpayer received property in the form of a binding contract to acquire GSM stock in April 1986. Thus, we reverse the judgment of the Tax Court and remand for further proceedings consistent with this opinion.

## FACTS

In February 1985, the taxpayer and George Beegle, the sole shareholder of GSM, first discussed the possibility that the taxpayer would leave his law firm and join GSM as its chief executive officer. On May 3, 1985, the taxpayer summarized his understanding of his agreement to join GSM in a letter, which Beegle acknowledged as an accurate reflection of their agreement as of May 1985.

The letter stated the parties intended to become partners, but provided that Beegle "will always be the 'controlling' party;" that the partners would split GSM's earnings after April 1, 1985, on a "40/60" basis, forty percent for the taxpayer and sixty percent for Beegle; and that the split would be achieved by the taxpayer's purchase from Beegle of options on forty percent of GSM's stock. The letter recognized the parties had not reached a "meeting of the minds," and negotiations over the terms of the taxpayer's employment with GSM continued.

On October 1, 1985, the taxpayer formally withdrew from his law firm, joined GSM, and soon became its president and chief executive officer. Later that month the parties rejected a draft agreement under which the taxpayer would have purchased 300 shares of GSM stock from Beegle for $240,000 and 125 shares of GSM stock from GSM for $100,-000.[4] During the last quarter of 1985, Richard Conger, a tax partner at Coopers & Lybrand, recommended that "a portion of GSM's future appreciation could be shifted to [the taxpayer] by creating 'frozen' preferred stock to be retained by Beegle, and [selling] new common stock to [the taxpayer]." 67 T.C.M. at 2109. The Tax Court found that "[u]ltimately, a modified version of Conger's plan was agreed upon—the modification being that two classes of common stock, rather than preferred and common stock, were used." *Id.* Conger's plan required GSM to restructure its capital stock.

In February 1986, to implement Conger's plan, GSM determined its value as of September 30, 1995, was $2,130,200, and retained its accounting firm, Hood & Strong, to formally review this valuation. In April 1986, after the circulation of several drafts, the taxpayer and Beegle executed a shareholder agreement, two employment agreements, and

---

person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable....
I.R.C. 83(a).

**3.** Section 83(e)(3) provides that § 83 is inapplicable to "the transfer of an option without a

readily ascertainable fair market value." I.R.C. § 83(e)(3).

**4.** The parties rejected this proposal because it required too large a cash outlay for the taxpayer and produced adverse tax consequences for Beegle.

other documents in connection with the restructuring of GSM's stock.[5]

The April 1986 shareholder agreement, which was back-dated to January 15, 1986, provided:

> C. ... The Company has adopted a Plan of Recapitalization....

> D. Immediately following the effective date of the Plan of Recapitalization, (the taxpayer) will purchase from Beegle all of the issued and outstanding 1,020 shares of the Class B Common Stock held by Beegle, at the fair market value of such shares, which the parties have agreed is $10.00 per share, or $10,200.

Joint Ex. 23–W at 1. The agreement also reflected the parties' intent to provide a total $2,120,580 liquidation preference for Class A common stock, to be retained by Beegle. This liquidation preference approximated GSM's value as of September 1985 less the amount to be paid by the taxpayer.[6] The agreement restricted the transfer of the taxpayer's rights to buy shares, and gave GSM a right of first refusal to repurchase from the taxpayer his shares or "any right or interest therein." *Id.* at 2. If GSM terminated the taxpayer, the agreement provided he would sell his shares to GSM or Beegle at a price based on GSM's value, "determined in accordance with generally accepted accounting principles," less the liquidation preference retained by Beegle. *Id.* at 4.

On October 1, 1986, GSM filed amended articles of incorporation with the state, formally creating two classes of common stock, Class A and Class B. This reorganization was treated as a tax-free reorganization under I.R.C. § 368(a)(1)(E) [7] based on Conger's understanding that the taxpayer did not own any GSM stock at that time. In November 1986, Hood & Strong issued a written report confirming the fair market value of $2,130,-200 for GSM as of September 30, 1985. Finally, on December 10, 1986, Beegle transferred all 1,020 shares of Class B stock to the taxpayer in exchange for a $10,000 promissory note. The taxpayer paid the note in January 1987. Neither GSM nor the taxpayer reported this transaction in their tax returns for 1985, 1986, or 1987.

The taxpayer resigned as GSM's president in late 1987 after a series of disagreements with Beegle and asked GSM to purchase his stock pursuant to the shareholder agreement. GSM refused, contending the entire shareholder agreement was invalid. In April 1989, the parties agreed GSM would pay the taxpayer $1.75 million and the taxpayer's acquisition of GSM stock would be rescinded.[8] After this settlement, however, GSM obtained a financial report from the Newport Group valuing the Class B stock at $3,526,320 as of December 31, 1986, which reflected the dramatic increase in GSM's value during 1986.[9] GSM then issued a new W–2c state-

---

5. In June 1986, the taxpayer and Beegle executed various other documents, including unanimous written consent of GSM's directors to adopt a plan of recapitalization and a certificate of amendment of GSM's articles of incorporation.

6. The liquidation preference was $9,620 less than GSM's value as of September 30, 1985. The taxpayer promised to pay $10,200, and ultimately paid $10,000, for his stock. There is no explanation in the record for these slight discrepancies in value.

7. A recapitalization is tax free, i.e., does not require the recognition of otherwise taxable gain, when it "represents merely a new form of the previous participation in an enterprise, involving no change of substance in the rights and relations of the interested parties one to another or to the corporate assets." *Bazley v. Commissioner*, 331 U.S. 737, 740, 67 S.Ct. 1489, 1491, 91 L.Ed. 1782 (1947).

8. According to the taxpayer, he paid tax on the amounts he received under the settlement agreement for a covenant not to compete and consulting agreement, *see* Reply Brief for Appellants at 9 n. 5, and GSM deducted the $1.75 million payment it made under the settlement agreement, *see* Tr. 21.

9. From the fair market value of $2,130,200 on September 30, 1985, as found by GSM's board of directors and confirmed by Hood & Strong, GSM's value increased dramatically during 1986. The Newport Group's report, on which the Commissioner relied, valued GSM at roughly $11 million as of December 31, 1986. 67 T.C.M. at 2113. The taxpayer's expert provided the following values for GSM during 1986: $2,944,136 on January 15, $3,357,771 on April 15, $5,311,099 on October 1, and $5,865,267 on December 10. Petitioner's Ex. 38. Even under the taxpayer's view, GSM's value appreciated rapidly during 1986.

ment of corrected income to the taxpayer, indicating that his 1986 wages should be increased by $3,516,320 (the Class B stock's value in the Newport Group's report less the $10,000 paid). GSM also claimed a $3,516,-320 deduction in an amended tax return for 1986.[10]

The Commissioner determined that the taxpayer received $3,516,320 in income pursuant to I.R.C. § 83 from the receipt of GSM stock on December 10, 1986 and assessed the taxpayer with a tax deficiency along with more than $500,000 in penalties. The Tax Court found the Commissioner had over-valued GSM's servicing portfolio, however, and held that the taxpayer received $2,356,-479 in income from the stock on December 10, 1986. The Tax Court also found the taxpayer was not liable for any penalties.

## THE TAXPAYER'S "PROPERTY" UNDER § 83

■ On appeal, the taxpayer contends the property he received from GSM was a binding contract to acquire stock in GSM, which he obtained as early as May 1985.[11] The Commissioner, on the other hand, contends that, at best, the taxpayer held an option contract to buy GSM's stock which he did not exercise until December 10, 1986. The Commissioner also argues that even if GSM transferred a binding contractual right to the taxpayer under § 83, the right was subject to a "substantial risk of forfeiture" at least until GSM amended its articles of incorporation to provide for two classes of stock on October 1, 1986.

The Tax Court found that the taxpayer did not pay for his shares until December 10, 1986, and that before such payment the taxpayer had nothing more than an executory contract conditioned on events yet to be performed. The Tax Court relied on a series of cases pre-dating the enactment of § 83 which hold that a person does not acquire a beneficial ownership interest in a company until he has fully performed all conditions precedent to the acquisition or furnished all required consideration for the transfer.[12] Under this analysis, the Tax Court valued the taxpayer's stock in GSM as of December 10, 1986.

■ Congress's primary intention in enacting § 83 was to address the disparity created by the favorable treatment of restricted stock plans vis-a-vis other mechanisms for providing deferred compensation. See Alves v. Commissioner, 734 F.2d 478, 480–81 (9th Cir.1984). Nonetheless, "Congress made section 83(a) applicable to all restricted 'property,' not just stock." Id. at 482. For the purposes of § 83, "the term 'property' includes ... personal property other than either money or an unfunded and unsecured promise to pay money or property in the future." Treas.Reg. § 1.83–3(e). A contractual right to acquire stock is not unsecured or unfunded if it is a binding obligation se-

10. According to the taxpayer, in GSM's claim for a tax deduction, GSM has agreed to be bound by the factual determinations of this case. See Brief for Appellants at 2 n. 4.

11. The Commissioner contends the taxpayer failed to make this argument below and thus has waived it. According to the Commissioner, the taxpayer argued to the Tax Court that he obtained only a beneficial interest in GSM in 1985, but now makes a "flatly inconsistent" argument that he obtained a contractual right to buy GSM's stock in 1985. See Brief for Appellee at 19.

We reject the Commissioner's waiver argument. The taxpayer's argument to the Tax Court that he obtained a beneficial interest in GSM in 1985 incorporated an argument that he had a contractual right in 1985 to purchase GSM's stock upon the completion of GSM's recapitalization. Specifically, the taxpayer argued he "had an ownership interest in GSM ... based upon the

contract, ... the reliance, [and] the economic substance of the transaction." Tr. 19 (emphasis added). Thus, this issue was at least implicitly presented to the Tax Court. In such circumstances, we think it would be unfair to deny the taxpayer his right to appeal on the basis of his contractual right to purchase GSM's stock. See Bolker v. Commissioner, 760 F.2d 1039, 1042 (9th Cir.1985) (allowing review of new argument "when the issue presented is purely one of law and ... the pertinent record has been fully developed").

12. See, e.g., Hayden v. Commissioner, 52 T.C. 1112, 1128–29, 1969 WL 1570 (1969); Carpenter v. Commissioner, 20 T.C. 603, 609, 1953 WL 278 (1953), aff'd, 219 F.2d 635 (5th Cir.1955); Scientific Instrument Co. v. Commissioner, 17 T.C. 1253, 1258–59, 1952 WL 351 (1952), aff'd per curiam, 202 F.2d 155 (6th Cir.1953); Armstrong v. Commissioner, 6 T.C. 1166, 1946 WL 299 (1946), aff'd per curiam, 162 F.2d 199 (3d Cir. 1947).

cured by valuable consideration. Thus, we hold that a contractual obligation to acquire stock, as well as an acquisition of stock itself, is "property" within the meaning of I.R.C. § 83, and if the contractual right to acquire stock is taxable under § 83, the subsequent purchase of the stock is not.

Given our holding that property within the meaning of § 83(a) includes a binding contract to acquire an employer's stock, the fact that the contract is "executory" is inapposite.[13] Our holding is consistent with *Estate of Ogsbury v. Commissioner,* 28 T.C. 93, 1957 WL 1027 (1957), *aff'd,* 258 F.2d 294 (2d Cir.1958), a case decided before the enactment of § 83. In *Ogsbury,* an employee exercised an option to purchase his employer's stock on December 31, 1945, but did not pay for or receive the stock until 1948, by which time the stock had substantially appreciated in value. The Tax Court found the employee should be taxed for this compensation in 1945 when he "obligated himself to pay for and accept the stock unconditionally within a limited period of time." 28 T.C. at 101. On appeal, the Second Circuit affirmed, holding that contracts to buy stock are taxable as employee compensation because the "binding commitment[ ]" marks the time at which the employee "first realize[s] measurable economic benefit." 258 F.2d at 296.[14]

The Tax Court's decision in *Montelepre Systemed, Inc. v. Commissioner,* 61 T.C.M. (CCH) 1782, 1991 WL 11508 (1991), *aff'd,* 956 F.2d 496 (5th Cir.1992), also supports our interpretation that a binding contract to acquire stock is "property" within the meaning of § 83. In *Montelepre Systemed,* the Tax Court held that a contractual right of first refusal, owned by a hospital operator and sold for $1.5 million to the hospital's buyer, fell within the scope of § 83. 61 T.C.M. at 1786. The Tax Court based its decision on the fact that the contractual right of first refusal could be given capital gains treatment and was not specifically excepted from the scope of § 83 under § 83(e). *Id.*

█ Examining these two factors, it is clear that the taxpayer's contract qualifies as property within the meaning of § 83. First, a contractual right to acquire stock may be treated as a capital asset under I.R.C. § 1221. *See Dorman v. United States,* 296 F.2d 27, 29 (9th Cir.1961) ("[I]t is clear that an executory contract [to purchase a partnership interest] is a capital asset."); *cf. Anderson v. United States,* 468 F.Supp. 1085, 1096–98 (D.Minn.1979) (treating contractual right of first refusal as a capital asset), *aff'd,* 624 F.2d 1109 (8th Cir.1980) (table case). Second, a binding contract to acquire stock is not specifically excepted from the scope of § 83 because it is neither an option contract under § 83(e) nor a right "similar to an option" under Treas.Reg. § 1.83–3(a)(4). Thus, we hold that the taxpayer's binding contract to acquire stock consists of property under § 83.

---

**13.** The cases regarding executory contracts on which the Tax Court relied relate directly to ownership of *stock* or corporate *control,* not the broader question of a transfer of *property* under § 83. *See, e.g., Hayden,* 52 T.C. at 1128 (addressing when stock is considered issued for purposes of qualifying as a § 1244 plan); *Scientific Instrument,* 17 T.C. at 1257–58 & n. 1 (addressing whether predecessor corporation or its shareholders had "control" of successor corporation due to ownership of successor corporation's stock "immediately after" corporate reorganization for purposes of "tax free reorganization"); *Armstrong,* 6 T.C. at 1172 (determining whether taxpayers acquired stock for purposes of capital gains holding period when they agreed to purchase shares of stock or when they paid for shares of stock). In *Carpenter,* 20 T.C. at 609, the Tax Court ruled the taxpayer-petitioner received income when a cooperative purchased stock on his behalf rather than when he was actually issued the stock certificates. The court

reasoned that "the petitioner's *right to the stock* ripened when the stock purchase was made." *Id.* (emphasis added). The factual record in *Carpenter* was unclear as to whether the contract to purchase stock occurred at a separate time than the actual purchase, and neither party argued the taxable event occurred at the time of the contract as opposed to the time of the stock transfer. *See id.* at 608–09.

**14.** The Commissioner distinguishes *Ogsbury* on the basis that the taxpayer in *Ogsbury* actually exercised his option whereas the taxpayer in this case did not exercise his "option" until December 10, 1986. As we discuss below, however, the taxpayer in this case had a binding contract to purchase GSM's stock, which produced a measurable economic benefit at the time of execution of the contract, rather than an option. Thus, we reject the Commissioner's attempt to distinguish *Ogsbury.*

*OPTION CONTRACT*

The Commissioner argues that even if a contract to acquire stock may be property under § 83, in this case the taxpayer was not *obligated* to buy GSM's stock and held, at best, an option to buy stock which he did not exercise until December 10, 1986.[15] We reject this view as did the Tax Court. It is true the parties originally contemplated using options in May 1985 to enable the taxpayer to obtain a forty percent ownership interest in GSM, but in October 1985 the parties explicitly rejected the use of options in favor of Conger's recapitalization plan. Moreover, the April 1986 shareholder agreement provided for the number and price of the Class B stock the taxpayer *would* purchase after GSM's recapitalization, not for the stock he *could* purchase. We find that when the taxpayer entered the contract to purchase stock from GSM, he became personally obligated to pay $10,000 to GSM, as long as GSM completed its reorganization, regardless of whether he thought the stock remained an attractive purchase.[16] The fact that the taxpayer was obligated for $10,000 is strong evidence he had already received property under § 83 when he made a binding contractual commitment to acquire GSM's stock. *See* Treas.Reg. § 1.83–3(a)(2) ("The determination of the substance of the transaction shall be based upon all the facts and circumstances [including] . . . the extent to which the risk that the property will decline in value has been transferred[.]").

We also read the Commissioner's brief as suggesting that the taxpayer's rights were similar to an option in part because GSM could not have enforced its right to $10,000 against the taxpayer until GSM obtained approval for its amended articles of incorporation on October 1, 1986. Specifically, the Commissioner argues California law prohibited the sale of securities by GSM prior to the amendment to GSM's articles of incorporation, citing *California Tel. & Light Co. v. Jordan,* 19 Cal.App. 536, 126 P. 598 (1912).[17] However, California enforces pre-incorporation subscription agreements as long as the corporation is successfully incorporated, *see Moser,* 200 P.2d at 12, and this reasoning applies with even more force for established corporations that need only amend their articles to reclassify their stock. *Cf. California Tel. & Light,* 126 P. at 602 ("The act of classifying or dividing the capital stock into two or more kinds, without any alteration or change in the number of shares of such stock, . . . involves nothing more than a contract between the stockholders as to how they shall divide the profits. . . ."). Therefore, we find that when the taxpayer entered into his binding contract to acquire GSM's stock, he did not hold an option under I.R.C. § 83(e), nor contractual rights "similar to an option" under Treas.Reg. § 1.83–3(a)(4), and thus received property within the meaning of § 83. *See Ogsbury,* 258 F.2d at 295–96 (1958).

*SUBSTANTIAL RISK OF FORFEITURE*

Even if the taxpayer had a binding contractual right, the Commissioner argues, it was subject to a substantial risk of forfeiture

---

**15.** If true, the value of the property the taxpayer received was properly valued by the Tax Court as of that date. Section 83(e)(3) provides that § 83 is inapplicable to "the transfer of an option without a readily ascertainable fair market value." I.R.C. § 83(e)(3). Moreover, "[a]n indication that no transfer [of property] has occurred [under § 83] is the extent to which the conditions relating to a transfer are similar to an option." Treas.Reg. § 1.83–3(a)(4). For example, if an employee provides a nonrecourse note in exchange for the employer's stock, and makes no payments on the note, the transaction is deemed an "option" rather than a "transfer" of property under § 83. *Id.* § 1.83–3(a)(7) example 2.

**16.** *See Moser v. Western Harness Racing Ass'n,* 89 Cal.App.2d 1, 200 P.2d 7, 12 (1948) ("An offer to purchase stock and to accept and pay for it upon specified conditions becomes binding upon the parties when it is accepted by the corporation, and the subscriber can thereafter withdraw only upon the failure of the corporation to meet the conditions."); *see generally* Ballatine on Corporations § 193, at 457–58 (1946) ("Ordinarily a conditional subscription should be regarded, if possible, as constituting a present contract with conditions precedent to the duty to pay or to deliver a certificate, from which the subscriber cannot withdraw unless the corporation fails in performance of the condition.").

**17.** Under California law the articles of incorporation must provide for the number and classes of stock which a California corporation is authorized to sell. Cal.Corp.Code § 202.

at least until October 1, 1986, when GSM filed its amended articles of incorporation.[18] "The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual." I.R.C. § 83(c)(1). Under the regulations,

[a] substantial risk of forfeiture exists where rights in property that are transferred are conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person, or the occurrence of a condition related to a purpose of the transfer, and the possibility of forfeiture is substantial if such condition is not satisfied.

Treas.Reg. § 1.83–3(c)(1).[19] The Commissioner argues the recapitalization was a condition related to the purpose of the transfer and thus there was a substantial risk of forfeiture.

■ We find there was no substantial risk of forfeiture based on the need to amend GSM's articles of incorporation. There is no argument the contract was "conditioned upon the future performance of substantial services." I.R.C. § 83(c)(1). There is also no argument the reason GSM sought to employ the taxpayer in the first place was primarily, or even largely, to carry out the recapitalization of GSM; at best, the recapitalization was incidental to GSM's employment of the taxpayer. It thus appears plain that the need to amend the articles was not "related to a purpose of the transfer." Treas.Reg. § 1.83–3(c)(1). Moreover, it is almost inconceivable that GSM would have been unable, in good faith, to gain approval for its amendment to its articles of incorporation, and thus in any event we find there was no *substantial* risk of forfeiture after the taxpayer's contract to acquire GSM's stock became binding.[20]

### TIMING OF THE CONTRACT

■ Under the Tax Court's view, at the latest, the parties had a binding contractual agreement in June 1986 when they had a "meeting of the minds" with regard to the

---

**18.** The Commissioner also contends that if we accept the taxpayer's theory, we are required to remand the issue of forfeitability for further factual development by the Tax Court. *See* Brief for Appellee at 20 n. 5. We disagree. The factual record is more than sufficient to determine, under the proper legal standards, whether the taxpayer's right to acquire GSM's stock was subject to a substantial risk of forfeiture.

We also note the relationship between the "substantial risk of forfeiture" analysis and the "option contract" analysis. The risk of forfeiture analysis requires a court to determine the chances the *employee* will lose his rights in property transferred by his employer. The "similar to an option" analysis requires a court to determine the chances that an *employer* will lose its rights in the employee's payment. Some factors—such as whether a contract to purchase stock is enforceable when the articles of incorporation do not provide for such stock—are relevant to both inquiries.

**19.** The regulations also illustrate what constitutes a substantial risk of forfeiture. If an underwriter receives stock "conditioned upon the successful completion of the underwriting," or if an employee receives stock which she must return "if the total earnings of the employer do not increase," there is a substantial risk of forfeiture. *Id.* § 1.83–3(c)(2). If "the property [must] be returned to the employer if the employee is discharged for cause or for committing a crime,"

however, there is no substantial risk of forfeiture. *Id.*

**20.** Under California law, in order to amend a corporation's articles of incorporation, a corporate officer must certify the wording of the amendment, the approval of the corporation's board of directors, and, if applicable, the approval of the corporation's shareholders. *See* Cal. Corp.Code § 905. Under its contract with the taxpayer, GSM had a duty to fulfill the condition of amending the articles "diligently." *See Moser*, 200 P.2d at 12. Beegle, the only shareholder, agreed to amend the articles in the April 1986 shareholder agreement. Amending the articles of incorporation is a simple ministerial act. If the state lacks a proper legal basis for refusing to allow the filing of an amendment to the articles, a party may compel such a filing through mandamus. *See, e.g., Pratt–Low Preserving Co. v. Jordan*, 217 Cal. 292, 18 P.2d 676, 678 (1933); *California Tel. & Light*, 126 P. at 603; *see generally* 9 B.E. Witkin, SUMMARY OF CALIFORNIA LAW *Corporations* § 76, at 579 (9th ed. 1989) ("Certificates may be rejected by the Secretary for noncompliance with the law.... But this duty is ... subject to control by mandamus."). Such a slim possibility of GSM's failure, in good faith, to amend the articles of incorporation cannot constitute a substantial risk of forfeiture of the taxpayer's property right after his contract with GSM became binding.

details of the recapitalization. 67 T.C.M. at 2116. The taxpayer, on the other hand, argues he had a contractual right to acquire a forty percent equity interest as early as May 1985 when he agreed to leave his law practice to join GSM. We think the transaction was too uncertain in its basic terms, however, until the April 1986 shareholder agreement to establish a vested contractual right in the taxpayer. The April 1986 agreement was the first time at which both the price and quantity terms were firmly established. Moreover, until the written shareholder agreement, the taxpayer's contractual right was in jeopardy under California's statute of frauds.[21] Thus, we find the April 1986 shareholder agreement marks the first time the taxpayer's contract right to acquire GSM's stock became binding and was not subject to a substantial risk of forfeiture. *Cf. Culp v. Commissioner*, 58 T.C.M. (CCH) 207, 211, 1989 WL 109424 (1989) (finding no transfer in property under § 83(a) until parties "actually consummated the contemplated [multi-million dollar] transaction in writing").[22]

## TAXPAYER'S FAILURE TO REPORT THE TRANSACTION

■ The Commissioner suggests, however, that the parties did not have a firm contractual agreement prior to December 10, 1986, because the taxpayer failed to report compensation income in 1985 or 1986 with respect to his contractual right to acquire

GSM's stock. In the Commissioner's view, the taxpayer's failure to report the transaction is evidence of a lack of contractual commitment. It is true that even if his contractual right was subject to a substantial risk of forfeiture, the taxpayer could have "elect[ed] to include" the transfer in his gross income under § 83(b) and protected himself from a subsequent challenge by the Commissioner.[23] Moreover, the regulations provide that a transferee may make such an election even if "the transferee has paid full value for the property transferred, realizing no bargain element in the transaction." Treas.Reg. § 1.83–2(a). *See also Alves*, 734 F.2d at 483 (employee who paid full market value for restricted stock in 1970 could have avoided treatment of the stock's appreciation as ordinary income by making an election to report transfer under § 83(b) in his 1970 tax returns). Nonetheless, we do not think the taxpayer's failure to make an election under § 83(b) in any way bars his claim that he had a binding contract before December 10, 1986, to acquire GSM's stock.[24] Rather, it is more likely that the lack of any reporting by either the taxpayer or GSM reflects their belief the transaction was a fair market exchange. In our view, a more telling fact of when the agreement became binding is that GSM failed to claim a $3.5 million deduction for employee compensation until more than three years later, which clearly suggests that in 1986 GSM thought the transaction was a fair market exchange which would generate

21. In California, a contract for sale of securities is not enforceable unless (1) there is a writing signed by the party against whom the contract is being enforced, (2) delivery of a certified security or payment for the security has been made without objection, or (3) the person against whom the contract is being enforced received, without objection, a written confirmation of the sale from the adverse party. *See* Cal.Comm.Code § 8319(1).

22. The Tax Court's finding that there was a "meeting of the minds" in June 1986 is consistent with our holding that the taxpayer had a binding contract to acquire GSM's stock as of April 1986, because the Tax Court's finding addressed the details of recapitalization, not the timing of the contract. To the extent the Tax Court's finding varies from ours, we find it to be clearly erroneous. We also note the written shareholder agreement between Beegle and the

taxpayer provides the type of clear evidentiary basis needed to facilitate the enforcement of the tax laws and preclude the possibility of tax fraud by parties falsely claiming the existence of an oral agreement after the fact in order to shift the tax burden from one party in favor of another.

23. An election under § 83(b) eliminates the need for a taxpayer to include a transfer under § 83(a) in a later tax year.

24. We note that an election under § 83(b) is not cost-free: if a taxpayer elects to include property as gross income, even though the property is forfeitable and is subsequently forfeited, the taxpayer may not claim a deduction for the loss. I.R.C. § 83(b). In this case, of course, the risk to the taxpayer was small ($10,000) and it would have been sensible to elect to report his contractual right in 1985 or 1986 under § 83(b).

no tax benefits for the company.[25] Quite simply, taxpayers are more likely to overlook what they think are fair market exchanges, which have no tax consequences, than they are to overlook potential multi-million dollar deductions.[26]

## VALUATION OF THE CONTRACT

On remand, the Tax Court must make findings as to the value of the taxpayer's contractual right to acquire GSM stock as of April 1986.[27] The taxpayer has appealed the Tax Court's valuation of the stock the taxpayer received on December 10, 1986, on the basis that the Tax Court erred by failing to discount the value of his Class B stock to reflect its lack of voting rights and control over GSM. This issue of minority discount will be relevant to the valuation of the taxpayer's contract and thus we address it here.

■ "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 1717, 36 L.Ed.2d 528 (1973) (quotation omitted). When there is no active market

for stock of a corporation, as here, one factor in determining value is "the degree of control of the business represented by the block of stock to be valued." Treas.Reg. § 25.2512–2(f). "Control means that, because of the interest owned, the shareholder can *unilaterally* direct corporate action, select management, decide the amount of distribution, re-arrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets." *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 251–52, 1990 WL 17251 (1990) (emphasis added); *see also Estate of Luton v. Commissioner*, 68 T.C.M. (CCH) 1044, 1053, 1994 WL 589560 (1994).

■ In a closely-held corporation, stock is ordinarily discounted to reflect the lack of control exercised by minority shareholders, especially when minority shareholders lack voting rights. *See Estate of Bright v. United States*, 658 F.2d 999, 1002–03 (Former 5th Cir.1981) (en banc). The Tax Court deviated from this ordinary practice, however, because it found the Class B stock gave the taxpayer "unusually broad" consent powers over the corporation's actions. 67 T.C.M. at 2118. Although the Class B stock to be purchased would have no voting rights, a majority of Class B stock—all of which was to be held by the taxpayer—could withhold consent from

**25.** It is true that the taxpayer, as GSM's president and chief executive officer, could have declined to claim a deduction for GSM because of his financial self-interest in avoiding the disclosure of taxable income for himself. There is no factual basis in the record to support such a theory, however, and it is clear that GSM and the taxpayer conducted arm's length negotiations over how to structure the taxpayer's purchase of GSM's stock.

**26.** GSM argued in its *amicus* brief to the Tax Court that the taxpayer could have secured more favorable tax treatment by paying GSM the $10,-000 he promised to pay before December 10, 1986. *See Amicus* Brief of GSM at 29. Undoubtedly, there could be cases in which payment would help demonstrate in an objective manner a party's intention to be bound, but in the circumstances of this case we find that payment was not required to establish that the taxpayer had a binding contract to acquire stock.

**27.** Consistent with the Tax Court's finding that the shareholder agreement was executed at "some time" in April 1986, the record reveals that the shareholder agreement was executed a short time before an April 30, 1986 letter trans-

mitting Beegle's wife's consent to the shareholder agreement. *See* Joint Ex. 16–P; Tr. 223–24; *see also* Tr. 231, 369, 903–04; Joint Ex. 25–Y (letter dated April 10, 1986, supplementing taxpayer's employment agreement); Tr. 368 (taxpayer discussing signing of employment agreement in the first two weeks of April). The taxpayer testified "the wives ... sign[ed] the consents to the share-holder agreement ... [a]nd I know there's correspondence exchanging those [documents] dated mid-April. That's how I'm putting the chronology together...." Tr. 369–70.

On remand, we request that the taxpayer and the Commissioner attempt to stipulate to the effective date of the shareholder agreement in April of 1986. If they cannot, the Tax Court should determine the date of the execution of the shareholder agreement on the basis of the record as a whole. In this regard, we note the Tax Court dismissed the fact that the April 1986 shareholder agreement was back-dated to January 15, 1986, as not controlling the timing of the transaction. We agree. *See, e.g., Hensel Phelps Const. Co. v. Commissioner*, 74 T.C. 939, 950–51, 1980 WL 4480 (1980), *aff'd*, 703 F.2d 485 (10th Cir.1983).

any merger, sale of all or substantially all of GSM's assets, loan or loan guarantee for employees, repurchase of outstanding stock by GSM, or authorization of additional stock or dividends. The Commissioner's expert witness testified "the attributes of that class B made it effectively controlling stock, and I'm not sure I would discount it." Tr. 623.[28]

We think the attributes of control reflected by the Class B stock are legally insufficient to overcome the presumption that minority shareholders in closely-held corporations will receive a discount in the valuation of their stock. GSM's Class B stock which the taxpayer agreed to purchase would be unable to "unilaterally direct" key corporate activities. *Newhouse,* 94 T.C. at 251–52. The parties' agreement contemplated that Beegle would be the controlling party; indeed, Beegle retained the power to terminate the taxpayer's employment as GSM's president and chief executive officer. It is true that the taxpayer, as the purchaser of the majority of the Class B shares, would have the power to veto certain distributions and reorganizations of the corporation, or even the overall sale of the corporation, but he would not have been able to compel such actions. These powers perhaps warrant a reduction in the taxpayer's minority discount, but they are not sufficient to overcome the fact that the taxpayer had a contract to purchase only a minority interest in the corporation and would have no voting rights. In *Luton,* 68 T.C.M. at 1053, for example, the Tax Court gave a twenty percent "lack of control" discount (in addition to a fifteen percent "lack of marketability" discount) even though the minority shares could force the company's liquidation under state law, a power which the Class B shares lacked in this case.

For the foregoing reasons, the judgment of the Tax Court is REVERSED and RE-

MANDED for proceedings consistent with this opinion.

---

**28.** The Commissioner's expert witness testified he based this assessment on conversations with three or four different people in the investment banking wor[ld]. I had a couple friends at Solomon Brothers. That was one place. I had a buddy at Paine Webber. That was another. When I described the attributes of this particular class B, it was pretty much a uniform response I got back. Not only is that not a discount, it might be a premium. Tr. 625. On cross-examination, however, the expert witness acknowledged he did not tell the investment bankers whom he called that the company was a closely-held corporation. Tr. 643–44.