**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK G. STROM and BERNEE D.
STROM,
              *Plaintiffs-Appellees,*

          v.

UNITED STATES OF AMERICA,
              *Defendant-Appellant.*

No. 09-35175

D.C. No.
2:06-cv-00802-RSL

MARK G. STROM and BERNEE D.
STROM,
              *Plaintiffs-Appellants,*

          v.

UNITED STATES OF AMERICA,
              *Defendant-Appellee.*

No. 09-35197

D.C. No.
2:06-cv-00802-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, Chief District Judge, Presiding

Argued and Submitted
August 5, 2010—Seattle, Washington

Filed April 6, 2011

4539

Before: William C. Canby, Jr., Stephen Reinhardt\* and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

---

\*Due to the death of Judge David R. Thompson, Judge Stephen Rein-
hardt, United States Circuit Judge for the Ninth Circuit, was drawn to
replace him. Judge Reinhardt has read the briefs and reviewed the record.

## COUNSEL

Darrell D. Hallett, Cori Flanders-Palmer, Chicoine & Hallett, P.S., Seattle, Washington, for the plaintiffs-appellees/cross-appellants.

Kenneth L. Greene, Ellen Page DelSole, John A. DiCicco, Acting Assistant Attorney General, Tax Division, Department of Justice, Washington, D.C., for the defendant-appellant/cross-appellee.

## OPINION

BERZON, Circuit Judge:

Ordinarily, when an employee is compensated with nonstatutory stock options that do not have a readily ascertainable fair market value at the time of the grant, the employee realizes income for tax purposes upon *exercising* the options.[1] *See* 26 U.S.C. §§ 83(a) & (e)(3)-(e)(4); 26 C.F.R. § 1.83-7(a). The taxpayer is taxed on an amount equal to the fair market value of the stock on the date of exercise minus the option price

---

[1]Statutory stock options are compensatory options meeting criteria entitling them to special treatment under the Internal Revenue Code. *See* 26 U.S.C. § 422. Compensatory options that do not meet these requirements are referred to as "nonstatutory." *See United States v. Tuff*, 469 F.3d 1249, 1251 n.2 (9th Cir. 2006) (citing *Cramer v. Comm'r*, 64 F.3d 1406, 1408-09 (9th Cir. 1995)).

paid for the stock. *See* 26 C.F.R. § 1.83-1(a)(1); *id.* § 1.83-7(a). Internal Revenue Code § 83(c)(3), however, allows taxpayers to defer recognition and valuation of income so long as a profitable sale of the stock acquired through the exercise of the options "could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934." 26 U.S.C. § 83(c)(3). Section 16(b), in turn, forbids a corporate insider from profiting on a purchase made within six months of a sale (or a sale made within six months of a purchase) of the corporation's stock. *See* 15 U.S.C. § 78p(b). If a taxpayer is permitted to defer tax consequences under IRC § 83(c)(3), the taxpayer will be later taxed on an amount equal to the fair market value of the stock on the date that § 83(c)(3) no longer applies minus the option price paid for the stock. *See* 26 U.S.C. § 83(a); 26 C.F.R. § 1.83-1(a)(1).

In this opinion, we first interpret the phrase "could subject a person to suit under section 16(b)" and determine what that phrase requires a taxpayer to demonstrate before she can postpone tax consequences under § 83(c)(3). We then hold that the taxpayer here has not demonstrated an entitlement to deferral of tax consequences under § 83(c)(3), and after addressing a distinct legal issue pertinent to the ultimate resolution of this case, reverse and remand for further proceedings.

## Factual and Procedural History

In November 1998, Bernee D. Strom was hired as the President and Chief Operating Officer ("COO") of Info-Space.com, Inc. ("InfoSpace").[2] She was appointed to the

---

[2] Bernee Strom and Mark G. Strom are both named plaintiffs in this case, because they filed joint federal income tax returns for the years at issue. The contested tax liability relates to income from stock options issued solely to Bernee Strom. We therefore use the name "Strom" to refer to Bernee as an individual, as well as to both Bernee and Mark as plaintiffs-appellees.

company's board of directors around the same time she was hired. According to Strom, about a year after joining Info-Space she announced that she was planning to leave the company because of ethical concerns with the way the company's founder "practiced business."

To avoid the market disruptions that might result from an abrupt resignation by the company President and COO, Strom agreed to continue working in a different position at Info-Space for a few more months. She transitioned into the role of President of InfoSpace Venture Capital Fund ("Ventures"), a new venture capital division of InfoSpace that later became a wholly-owned subsidiary. Strom stayed on the board of directors of InfoSpace until April 2000 and remained President of Ventures until June 30, 2000, at which time she voluntarily resigned from Ventures and severed all connection to InfoSpace.

When Strom was hired as President of InfoSpace, she entered into three stock option agreements granting her a conditional right to purchase a total of 750,000 shares of Info-Space stock at $15 per share. Most of the stock options were not vested at the time of grant. Instead, the option agreements provided that Strom would acquire a right to purchase a fixed number of shares on specified future dates. Two of the agreements, collectively covering 500,000 shares, provided that Strom's right to buy those shares would vest on certain dates so long as she was not terminated for cause or did not voluntarily leave InfoSpace or an InfoSpace affiliate. The third agreement governed the remaining 250,000 shares and provided that, so long as Strom was not terminated for cause or did not voluntarily leave the company, her options to buy those shares would vest at the latest six years after her start date, but sooner if gross revenue and net income performance criteria were met.

Strom exercised options to acquire shares in September and December 1999, and then almost monthly through July 19,

2000. Because the market price of InfoSpace stock rose substantially during 1999 and early 2000, the value of the stock greatly exceeded Strom's $15 option price during that period. In March 2000, the value of InfoSpace stock began rapidly to decline. By January 2001, the market value fluctuated between $55 and $64 per share, down from prices in excess of $1000 per share in early 2000 (though still in excess of Strom's $15 option price).[3] At issue here is whether Strom can postpone tax consequences attributable to her option exercises during this period. Because she must report as gross income the difference between the market value of the stock and her $15 option price, her taxes will be significantly lower if she can defer calculation of income until a period after the stock price dropped. *See* 26 U.S.C. § 83(a); 26 C.F.R. § 1.83-1(a)(1).

During Strom's employment, InfoSpace was involved in mergers with three different companies. We explain the pertinence of those mergers below, but in brief, Strom maintains that she was subject to an InfoSpace policy that restricted her from selling her stock for a few months before and after each merger. InfoSpace created that policy, Strom represents, to comply with pooling-of-interests accounting rules, a method of accounting for business combinations or mergers permitted during the tax years at issue.

Strom reported as gross income for 1999, the year she began exercising options, the difference between the market value of the InfoSpace stock on the dates she exercised her options and the $15 option price. InfoSpace withheld federal income and Medicare taxes from Strom's wages for 1999 with respect to that income. Strom did not, however, report any income on her 2000 income tax returns related to her exercise of InfoSpace options, even though she exercised

---

[3]When Strom voluntarily left Ventures in June 2000, she lost the ability to exercise unvested options to purchase 489,581 shares that would have vested at various dates through November 2001.

options that year. InfoSpace did not withhold income tax with respect to Strom's exercise of stock options in 2000, but it did withhold Medicare tax premised on her realizing income by exercising those options.

Strom filed administrative claims with the IRS seeking a refund of the income and Medicare taxes paid in 1999 and the Medicare taxes paid in 2000. When the IRS failed to act on Strom's claims, she brought the instant refund suit in district court seeking to recover approximately $3.7 million.[4] *See* 26 U.S.C. § 7422; 28 U.S.C. § 1346.

The district court granted Strom's motion for summary judgment in the main, holding that she was entitled to defer the calculation and recognition of income attributable to her option exercises until December 23, 2000, almost the entire period at issue. The district court also granted summary judgment in favor of the government on a narrow ground, ruling that Strom could not *further* defer tax consequences through January 2001.

The parties cross-appealed.

## Discussion

## I

## A

[1] As noted above, the ordinary rule is that an employee realizes income for tax purposes upon *exercising* a compensatory nonstatutory stock option that does not have a readily

---

[4]The IRS subsequently issued a notice of deficiency for taxes not paid in 2000. Bernee Strom and Mark Strom each filed separate Tax Court petitions seeking a redetermination of that deficiency. Those Tax Court cases have been stayed pending resolution of this appeal. *Bernee D. Strom v. Comm'r*, Docket No. 16711-08; *Mark G. Strom v. Comm'r*, Docket No. 16258-08.

ascertainable fair market value at the time it is granted.[5] 26 U.S.C. § 83(a) & (e)(3)-(e)(4); 26 C.F.R. § 1.83-7(a). This rule does not apply, however, until the employee's rights to the stock obtained "are transferable or are not subject to a substantial risk of forfeiture." 26 U.S.C. § 83(a). In other words, the employee can defer calculation of the gain realized until her rights to the stock are relatively secure.[6] *Id.* The taxpayer is then taxed on an amount equal to the "fair market value of such property . . . at the first time the rights . . . in such property are transferable or are not subject to a substantial risk of forfeiture, which ever occurs earlier, over . . . the amount (if any) paid for such property." *See* 26 U.S.C. § 83(a)(1)-(2); *see also* 26 C.F.R. § 1.83-1(a)(1).

**[2]** Rights in property can be "subject to a substantial risk of forfeiture" for a variety of reasons. For instance, an employee might receive property subject to a condition that it be forfeited if performance targets are not achieved. *See generally* 26 C.F.R. § 1.83-3(c)-(d) (providing examples). Ordinarily, this determination "depends upon the facts and circumstances" of the case. *Id.* at § 1.83-3(c). But the Internal Revenue Code enumerates some specific ways property is deemed subject to a substantial risk of forfeiture and not transferable. The provision pertinent to this case, § 83(c)(3), provides:

> So long as the sale of property at a profit *could subject a person to suit under section 16(b)* of the Securities Exchange Act of 1934, such person's rights in such property are — (A) subject to a substantial risk of forfeiture, and (B) not transferable.

---

[5]The parties agree that Strom's InfoSpace stock options did not have a readily ascertainable fair market value when granted.

[6]Even if a taxpayer's rights in property *are* subject to a substantial risk of forfeiture and not transferable, the taxpayer can elect immediately to include as taxable income the excess of the fair market value of the property received over the amount paid for it. *See* 26 U.S.C. § 83(b). Strom did not make such an election.

26 U.S.C. § 83(c)(3)(A)-(B) (emphasis added). Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act") is a prophylactic rule prohibiting corporate insiders from profiting on "short-swing" securities trades—specifically, on a purchase and a sale of their company's securities made within any period of less than six months. An insider who makes a prohibited trade must disgorge to the issuer any profit she received. *See* 15 U.S.C. § 78p(b); *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 234 (1976).

**[3]** IRC § 83(c)(3) remedies a tension created by the interaction of the tax and securities laws—namely, that absent the provision, a taxpayer could be forced to realize income on the exercise of options when, as a practical matter, she could not convert the stock received to cash without facing a realistic threat that she would forfeit the cash in a § 16(b) suit. Indeed, Congress enacted § 83(c)(3) in response to a series of decisions from the United States Tax Court holding that taxpayers in such situations could *not* defer tax consequences, because "section 16(b) of the Securities Exchange Act . . . does not make the stock nontransferable, and therefore does not affect the taxation of the stock." H.R. Rep. No. 97-201, 97th Cong., 1st Sess., 263 (1981), *reprinted in* 1981-2 C.B. 352, 404 (citing *Horwith v. Comm'r*, 71 T.C. 932 (1979)). The House Ways and Means Committee considered that result "inequitable." *Id.* Thus, § 83(c)(3) was enacted to ensure that "stock subject to the application of section 16(b) . . . will be treated as being subject to a substantial risk of forfeiture for the 6-month period during which that section applies." *Id.* In other words, § 83(c)(3) allows a taxpayer to postpone the tax consequences attributable to the exercise of options where she might otherwise be taxed on property that she could not realistically liquidate into cash. *See* 2 Boris I. Bittker & Lawrence Lokken, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 60.4.3, at 60-38 (2d ed. 1990) ("Section 83(c)(3) was enacted to relieve the liquidity problem that formerly arose when employees subject to § 16(b) were taxed on the receipt of stock but could not immediately sell the stock to raise

money to pay the tax without incurring liability under § 16(b).").

## B

**[4]** The key statutory question under IRC § 83(c)(3) is what "could subject a person to suit under section 16(b)" means. As we explain below, that phrase signifies the following: A taxpayer may postpone tax consequences attributable to the exercise of options if she can demonstrate that, if she had sold stock and a § 16(b) suit was brought against her, there is an objectively reasonable chance that the suit would have succeeded.

**[5]** Starting, as usual, with the language of the statute, *see, e.g.*, *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1096 (9th Cir. 1999) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)), we determine the meaning of the statutory provision by "examin[ing] not only the specific provision at issue, but also the structure of the statute as a whole. "*Id.* (internal citations omitted). Here, the statutory provision, § 83(c)(3), speaks of subjecting a person to "suit" under § 16(b). 26 U.S.C. § 83(c)(3). This language makes clear that a taxpayer need not demonstrate that she would have been *liable* if she had sold stock and a § 16(b) suit was brought against her. If Congress intended such a result, the statute would have been drafted to so provide—stating, for example, that rights in property are subject to a substantial risk of forfeiture and not transferable, "[s]o long as the sale of property at a profit could subject a person to *forfeiture* of the profit under section 16(b)."

**[6]** Our interpretation is supported by the consideration that the "could subject a person to suit" phrase describes a specific instance in which rights in property are subject to a "substantial *risk* of forfeiture" and "not transferable." 26 U.S.C. § 83(c)(3). A *risk* of forfeiture of profits from the sale of stock exists even where a § 16(b) suit with a reasonable

chance of success is brought, yet ultimately fails. Likewise, in that case, Congress has determined (when it rejected the cases to the contrary by enacting § 83(c)(3)), that the stock itself is as a practical matter not transferable, because a prudent person would not sell it in the face of the legitimate threat of forfeiting the profits obtained from the sale. Finally, the phrase "could subject a person to suit" accounts for the likelihood that, in cases where the application of § 16(b) is not clear, a taxpayer will be unwilling to sell stock for fear of incurring substantial legal expenses defending herself against a § 16(b) suit that could survive a motion to dismiss or summary judgment but might nonetheless fail.[7]

   **[7]** At the same time, and conversely, § 83(c)(3) does not apply where *any* § 16(b) suit, even an entirely frivolous one, could have been filed against the taxpayer. The "could subject a person to suit" language of § 83(c)(3), standing alone, could perhaps be so read. But the provision, as noted, is expressly

---

[7]We are aware of three decisions that might be read as assuming § 83(c)(3) requires a taxpayer to show that she would have been *liable* under a § 16(b) suit had she sold stock. *See Hernandez v. United States*, 450 F. Supp. 2d 1112, 1117 (C.D. Cal. 2006) (stating that the taxpayers "proffered no evidence that [a party] would have successfully brought a § 16(b) claim"); *Montgomery v. Comm'r*, 127 T.C. 43, 61 (2006) (noting that the petitioner "simply has not persuaded us that his liability under section § 16(b)" extended into the relevant period); *Tanner v. Comm'r*, 117 T.C. 237, 245 (2001) ("If we consider solely the liability created by section 16(b), the section 16(b) period expired . . . and section 83(c)(3) is not applicable."), *aff'd*, 65 F. App'x 508 (5th Cir. 2003). These decisions, none of which constitute binding authority, did not consider whether § 83(c)(3) contemplates deferring tax consequences on the basis of a § 16(b) suit that threatens a *reasonable possibility* of success but that might ultimately fail. In all three instances, the courts conclusively determined that a necessary element of a potential § 16(b) suit was absent, and so liability could not exist. *See Hernandez*, 450 F. Supp. 2d at 1118 (noting the lack of evidence that plaintiffs were statutory insiders); *Montgomery*, 127 T.C. at 61 (rejecting the petitioner's argument that his transactions were "discretionary," and holding that the period for which deferral was sought was outside the statutory 6-month period); *Tanner*, 117 T.C. at 244-45 (same).

described in the statute as a particular circumstance in which rights in property are "subject to a substantial risk of forfeiture" and "not transferable." 26 U.S.C. § 83(c)(3)(A)-(B). It would be senseless to say that there was "a *substantial* risk of forfeiture" and that rights were "not transferable" if a potential § 16(b) suit threatened no realistic possibility of forcing an insider to disgorge profits from a securities sale.

**[8]** Moreover, the precept that § 83(c)(3) requires a *realistic* chance of forfeiture is consistent with our prior treatment of the term "substantial risk of forfeiture" as it appears in other subsections of § 83. As noted above, rights in property can be subject to a "substantial risk of forfeiture" under § 83 for a variety of reasons. In these other contexts, "[t]he risk of forfeiture analysis requires a court to determine the *chances the employee* will lose his rights in property transferred by his employer." *Theophilos v. Comm'r*, 85 F.3d 440, 447 n.18 (9th Cir. 1996) (emphasis added). We have not defined how likely the "chances" that an employee will lose property rights must be, but our caselaw requires more than a remote risk. For instance, in *Theophilos*, an employee signed an agreement obligating him to purchase stock in a corporation once it amended its articles of incorporation. *Id*. at 442-43. The Commissioner maintained that the contractual right to buy the stock was subject to a substantial risk of forfeiture until the corporation actually amended its articles of incorporation, which required approval from the corporation's board of directors and shareholders. *Id*. at 444. We rejected that argument because, among other reasons, we found it unlikely that the corporation would have been unable, in good faith, to gain approval for the amendment. Thus, "there was no *substantial* risk of forfeiture" after the contract to acquire stock became binding. *Id*. at 447 (emphasis added); *see also Robinson v. Comm'r*, 805 F.2d 38, 41 (1st Cir. 1986) (explaining that, for purposes of § 83(a), "[t]he use of the modifier *substantial* indicates that the risk must be real").

There is no reason to interpret the phrase "could subject a person to suit under section 16(b)" contained in § 83(c)(3) any

differently from how we interpret other ways that rights to property are subject to a substantial risk of forfeiture under § 83. These subsections are intended to protect taxpayers who possess only limited rights in property from immediate taxation; in such instances, we evaluate the realistic chances that an employee will be forced to forfeit their property rights. *See Gonzales v. Oregon*, 546 U.S. 243, 273 (2006) ("[S]tatutes should not be read as a series of unrelated and isolated provisions." (quotation omitted)); *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) ("In ascertaining the plain meaning of a statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." (quotation omitted)).

**[9]** Given the statutory text and context, and in light of the congressional intent underlying the provision, the best interpretation of § 83(c)(3) is that a taxpayer may defer the calculation and recognition of income if there is an objectively reasonable chance that a suit under § 16(b) based on a sale of her stock would have succeeded. That standard roughly equates to a determination of whether a reasonably prudent and legally sophisticated person would *not* have sold her stock, because, if a § 16(b) suit had been brought against her, she likely would have been forced to forfeit the profit obtained by the sale (or, at a minimum, she would have faced substantial legal expenses defending herself against a claim not readily dismissed).

The standard we adopt is somewhat more stringent than the Federal Rule of Civil Procedure 11 frivolousness standard used by the district court. Rule 11 sets a low bar: It deters "baseless filings" by requiring a "reasonable inquiry" that there is some plausible basis for the theories alleged. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990); *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) ("[T]he word 'frivolous' . . . denote[s] a filing that is *both* baseless *and* made without a reasonable and competent inquiry." (quotation omitted)); *United Nat'l Ins. Co. v. R & D*

*Latex Corp.*, 242 F.3d 1102, 1117 (9th Cir. 2001) (reversing Rule 11 sanctions because "[c]ounsel . . . had *some* plausible basis, albeit quite a weak one" for the argument advanced). So, for example, a suit raising a novel issue of law as to which there is no caselaw to the contrary would not be subject to Rule 11 sanctions, even if it was subject to dismissal on the pleadings for failure to state a claim for relief. *See, e.g., Larez v. Holcomb*, 16 F.3d 1513, 1522 (9th Cir. 1994) ("[W]e must exercise extreme caution in sanctioning attorneys under Rule 11, *particularly* where such sanctions emerge from an attorney's efforts to secure the court's recognition of new rights."); *Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 167 (2d Cir. 1999) ("[T]o constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." (quotation omitted)). We do not believe that a reasonably prudent and legally sophisticated insider would hesitate to sell stock *simply* because a § 16(b) suit not squarely foreclosed by existing precedents could be filed against her.

We also note that a suit capable of surviving a Rule 12(b)(6) motion to dismiss is not *necessarily* sufficiently meritorious to satisfy the standard we articulate for § 83(c)(3), although it could be. A taxpayer seeking deferral of tax consequences under § 83(c)(3) will often have access to factual information regarding whether a transaction would be prohibited by § 16(b). She therefore could be relatively certain that, although a § 16(b) suit might survive a Rule 12(b)(6) motion because it is dependent on a minimal factual showing, it could not succeed an early summary judgment motion premised on establishing the requisite facts. Thus, while an insider might be assured to a near certainty that she will not be liable in a § 16(b) suit because the challenged transactions were not prohibited, the applicability of § 16(b) often will turn on factual issues not appropriately resolved on a motion to dismiss—for example, whether the transactions were approved by the issu-

er's board of directors and so exempt from § 16(b). *See* 17 C.F.R. § 240.16b-3(d)(1). In such a case, there is not a realistic possibility that the taxpayer would forfeit her profits in a § 16(b) suit, and so her property rights cannot be characterized as "subject to a substantial risk of forfeiture."

[10] Having established the standard for deferral of tax consequences under § 83(c)(3)—namely, a taxpayer must show that a § 16(b) suit premised on a sale of her stock would have had an objectively reasonable chance of success—we now turn to whether Strom has demonstrated that a sale of her InfoSpace stock could have subjected her to a § 16(b) suit meeting that standard.

## II

### A

Section 16(b) of the Exchange Act reads in relevant part:

> For the purpose of preventing the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . involving any such equity security within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction.

15 U.S.C. § 78p(b).

[11] Thus, "[t]here are four basic elements of a Section 16(b) claim: '(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's

securities (4) within a six-month period.' " *Simmonds v. Credit Suisse Sec. (USA) LLC*, ___ F.3d ___, 2011 WL 135693, at \*3 (9th Cir. Jan. 18, 2011) (quoting *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998)). We have described § 16(b) as a "blunt instrument" targeted at a " 'class of transactions in which the possibility of abuse was believed to be intolerably great.' " *Dreiling v. Am. Express Co.*, 458 F.3d 942, 947 (9th Cir. 2006) (quoting *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 592 (1973)). Consequently, "the statute is over-inclusive in that it imposes strict liability regardless of motive, including trades not actually based on inside information." *Id.* (citing *Kern County*, 411 U.S. at 595). "It is under-inclusive in that there is no liability for trades made on inside information if more than six months transpire between purchase and sale."[8] *Id.*; *see also* 4 Thomas Lee Hazen, THE LAW OF SECURITIES REGULATION § 13.2[1] (6th ed. 2009).

[12] Here, the parties disagree on the dates at which Strom "purchased" her options, and thereby contest the period that she could have been liable under § 16(b) if she had sold stock.[9]

[13] Strom contends that her options were "purchased" under § 16(b) on each date that they *vested*. Because her options vested periodically every six months or less, she claims that any sale of her stock could have been matched with any of those periodic vesting dates. Under this theory, she was precluded from selling her stock from November

---

[8]Of course, inside information can be traded on unfairly outside the statutory six-month period. While an insider in such a case might be liable under a different statute or rule, she would not be liable under § 16(b). *See generally Foremost-McKesson*, 423 U.S. at 255-56 (listing other remedies for abuse of insider information).

[9]The parties also dispute Strom's insider status toward the end of her time with InfoSpace. We do not reach that issue, because, as we explain, the window of potential § 16(b) liability ended before the period when her insider status is in question.

1998 (i.e., the date the first options vested) until December 23, 2000 (i.e., six-months after the final vesting date).

**[14]** The government disagrees, maintaining that the sole "purchase" under § 16(b) occurred when Strom was *granted* the options in 1998; subsequent vesting of the options were not "purchases." According to the government, therefore, the six-month window for potential liability under § 16(b) would have ended in May 1999, six months after she was granted the unvested options and about four months before she exercised any of them.

**[15]** If Strom's theory is correct (i.e., that each vesting date constituted a new "purchase" under § 16(b)), or if a suit premised on that theory would have had a realistic chance of imposing § 16(b) liability, then she could not have sold stock from November 1998 until December 23, 2000 without facing a serious risk of forfeiting the profit in a § 16(b) suit, or at least incurring considerable legal fees defending such a suit. Thus, under the tax provision discussed above, § 83(c)(3), she could defer tax consequences from her exercises of options throughout the entire period because she was exposed to a § 16(b) suit with an objectively reasonable chance of success.[10] If her theory is wrong, or does not at least present a close question, then she was free to sell her stock after May 1999 without risk of § 16(b) liability, and so she was not entitled to defer tax consequences under § 83(c)(3) from her exercise of options after that date.

**B**

**[16]** To evaluate Strom's § 16(b) thesis, we need to delve into treatment under the Exchange Act of derivative securities generally and stock options in particular. The Exchange Act itself says nothing about whether the grant or vesting of an

---

[10]This theory assumes, of course, that her sale of stock was not *otherwise* exempt from the prohibitions of § 16(b), a point we address below.

unvested option is considered the "purchase" of an equity securi-ty.[11] The accompanying regulations, however, offer several pertinent definitions.

Those regulations provide, first, that the "establishment of . . . a call equivalent position . . . shall be deemed a purchase of the underlying security for purposes of section 16(b)." 17 C.F.R. § 240.16b-6(a). A "call equivalent position," in turn, is defined as a "derivative security position that increases in value as the value of the underlying equity increases." *Id.* § 240.16a-1(b). Finally, "derivative securities" include any "option . . . with an exercise or conversion privilege at a price related to an equity security, or . . . with a value derived from the value of an equity security." *Id.* § 240.16a-1(c).

Undoubtedly, under these definitions, when Strom's options vested, they constituted "derivative securities" provid-ing her with a "call equivalent position." Because the options had a fixed exercise price, their value was derived from the value of the underlying stock (meaning that, when the stock price rose, the value of her options rose with it). The harder question is whether a call equivalent position was "establish[ed]"—and so a "purchase" occurred for § 16(b) purposes—*earlier* than the vesting dates. Specifically, did a "purchase" occur when the options were originally granted but were not yet vested and so could not be exercised?

**[17]** The starting point for addressing this question is an

---

[11]The statute does define "purchase" and "sale": "[U]nless the context otherwise requires," the term "purchase" includes "any contract to buy, purchase, or otherwise acquire," and the term "sale" is defined to "include any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a)(13) & (14). These definitions, however, provide little guidance, because "[t]he cases go well beyond th[ese] general definition[s], including . . . a broad range of transactions" seemingly outside of the "contract[s]" mentioned in the statutory text. *Kay v. Scientex Corp.*, 719 F.2d 1009, 1012 (9th Cir. 1983); *Kern County*, 411 U.S. at 594 (acknowledging that § 16(b) covers "many transactions not ordinarily deemed a sale or purchase").

SEC rule promulgation in 1991 that overhauled the treatment of derivative securities for purposes of § 16 (including establishing the definitions quoted above). Those rules, and an accompanying agency release explaining them, clarified that the "grant" or "acquisition of [a] derivative security" constitutes the "purchase" of that security under § 16(b). Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Release No. 34-28,869, 56 Fed. Reg. 7242, 7248, 7251 (Feb. 21, 1991) [hereinafter "1991 Release"]. So long as the derivative security has a fixed price when granted, its value is a function of the price of the underlying equity security.[12] *Id.* at 7249. The profit obtainable from the option is the difference between the fixed price at acquisition and the price at which stock obtained through exercise of the option is eventually sold. Thus, the potential for insider abuse arises when the option price is negotiated and fixed, and it is *that* date that is matched as a "purchase" with the eventual "sale" of stock under § 16(b). This framework recognizes that, "holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of section 16." *Id.* at 7248. In both instances, the security is "purchased" under § 16(b) when acquired, not at some later date. *Id.*

**[18]** Contrary to Strom's contentions, the SEC's 1991 rules and the Release accompanying those rules do not differentiate between vested and unvested securities. Rather, the 1991 Release interpreted the then-new rules to mean that a "purchase" under § 16(b) occurs on the date stock or a derivative security is granted, regardless of whether the security is vested when granted. The SEC explained that, in the case of stock,

> [T]he acquisition of restricted stock containing vesting or forfeiture provisions likewise is deemed to

---

[12]The rules expressly exempt options that do not have a fixed price when granted. *See* 17 C.F.R. § 240.16b-6(a).

> occur as of the date of grant *even if not vested or subject to risk of forfeiture. . . . The vesting of the stock or the lapse of a forfeiture provision is not a reportable event for purposes of section 16.*

1991 Release at 7256 (emphasis added).

This passage clarifies that unvested securities are acquired, and thus "purchased" under § 16(b), when *granted*. Moreover, because the SEC did not intend the vesting of restricted stock to constitute a reportable event under § 16(a), the agency also did not intend vesting to constitute a "purchase" under § 16(b). This conclusion follows because any event that triggers liability under § 16(b) must first be a reportable event under § 16(a). *See Citadel Holding Corp. v. Roven*, 26 F.3d 960, 965 (9th Cir. 1994) ("[W]here the SEC does not require reporting under § 16(a), there can be no liability under § 16(b).").[13]

While the portion of the 1991 Release quoted above addresses the acquisition of stock, not derivative securities, there is every indication that the SEC's interpretation of its rules treats the two forms of securities identically in this respect. The SEC emphasized in the 1991 Release the "functional equivalence of derivative securities and their underlying equity securities for section 16 purposes." 1991 Release at 7248. Indeed, a primary justification for the 1991 rules was to "equate[ ] ownership of the derivative security to owner-

---

[13]SEC Rule 16a-10 excludes from the short-swing prohibitions in § 16(b) any transaction exempted from the reporting requirements contained in § 16(a). 17 C.F.R. § 240.16a-10; *see also Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 426 (1972) ("[T]he Commission has used its power to grant exemptions under § 16(b) to exclude from liability any transaction that does not fall within the reporting requirements of § 16(a)."). The converse is not true. For instance, the exercise of an option is a reportable event under Rule 16a-4(b), *see* 17 C.F.R. § 240.16a-4(b), but it is a non-event for purposes of determining liability under § 16(b). *See id*. § 240.16b-6(b).

ship of the underlying equity security." *Id*. at 7249. More directly, the SEC specifically explained that a "derivative security" is reportable upon acquisition, "whether or not the derivative security is presently exercisable." *Id*. at 7252.

**[19]** In sum, the SEC's 1991 Release contemporaneously interpreted its then-new rules as establishing three related principles: (1) Fixed-price derivative securities are "purchased" under § 16(b) when granted or acquired; (2) that rule applies to securities that are unvested or not immediately exercisable; and (3) the vesting of restricted stock or derivative securities is not reportable under § 16(a) and so cannot be a "purchase" under § 16(b). Contrary to Strom's theory, the date of vesting is not reportable and does *not* constitute a "purchase."

We owe "substantial deference" to the SEC's "published interpretation of its own regulations and will treat it as controlling if it is not 'plainly erroneous or inconsistent with the regulation[s].' " *SEC v. Phan*, 500 F.3d 895, 904 (9th Cir. 2007) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted)). Here, the SEC's interpretation is sensible and furthers the purposes of § 16(b). Underlying the prohibitions contained in § 16(b) is the presumption that inside information will often motivate both a "purchase" and a "sale" made within a short period. *See, e.g., Blau v. Max Factor & Co.*, 342 F.2d 304, 308 (9th Cir. 1965). The opportunity to abuse inside information arises when an insider negotiates an option price. It therefore makes sense to identify the date an option price is fixed and granted as triggering the six-month § 16(b) period. Subsequent vesting, in contrast, generally occurs more or less automatically—for example, as is the case here, vesting may be contingent only on continued employment and the passage of time. Under these circumstances, there generally is no opportunity for the insider to manipulate the vesting of her options on the basis of material inside information. While investors might unfairly trade on inside information within six months of the *vesting* dates,

such transactions should not be covered by § 16(b); the § 16(b) rule is "under-inclusive" and targets paired transactions that *both* offer the opportunity for an insider to abuse material inside information, whether or not that opportunity is exploited. *See Dreiling*, 458 F.3d at 947.

To illustrate, consider an example, slightly altered, from the 1991 Release:

> [A]n insider with knowledge of a positive material development, to be announced shortly, determines that while he wants to retain his existing equity position, he wants to take advantage of the information, so he [negotiates and is granted fixed price options that will vest in 10 months]. After the public announcement and rise in stock price the insider sells his common stock [that he otherwise holds], obtaining a short-swing profit, knowing that he can replace the [common stock] shares at a predetermined price since he holds the [options].

1991 Release at 7250. In this example, it makes sense to match the insider's grant of the unvested options as a "purchase" with the "sale" of common stock—inside information motivated both transactions. In contrast, there is no potential for the manipulation of inside information on the subsequent vesting date of the option, so there is no reason to think that that date should fall within the "class of transactions in which the possibility of abuse was believed to be intolerably great." *Dreiling*, 458 F.3d at 947 (quoting *Kern County*, 411 U.S. at 592).

The SEC's interpretation therefore comports with the purposes of § 16(b). Strom does not argue otherwise, or that the interpretation is erroneous or inconsistent with the agency's regulations. Rather, she advances several reasons to think that the SEC in fact *meant* to treat vested and unvested options differently in the 1991 Release. None of these arguments per-

suades us that our interpretation of the SEC release is incorrect.

Strom points out, first, that the statements from the 1991 Release indicating that the then-new rules governed derivative securities, "whether or not [they are] presently exercisable," discuss *reporting* requirements under § 16(a), and those requirements are not entirely coextensive with § 16(b). But as we explained, where reporting is not required, § 16(b) liability cannot attach. *See Citadel*, 26 F.3d at 965. Thus, when the SEC states that the vesting of a security is not a reportable event, the agency is also saying that vesting does not constitute a "purchase" under § 16(b).

Next, Strom argues that the SEC's statements about "present[ ] exercisab[ility]" should be read as referring to instances "where an option is vested, such that the holder has an absolute right to exercise it, but cannot do so until some future date." She contends that her options were different because she would lose the right to exercise them if she left the company. Her argument is squarely precluded by the SEC's conclusion that a security is acquired when granted, "even if not vested or subject to risk of forfeiture." 1991 Release at 7256.

Finally, Strom seizes on instances in the 1991 Release where the SEC explains that derivative securities should be treated identically to the underlying equity securities, because ownership of either provides opportunities to "lock in" profit. *Id*. at 7249. Strom claims that she did not have sufficiently complete ownership of her options (because of the contingencies attached to them), and so she was never *guaranteed* a profit. Thus, she maintains, her unvested options were not the functional equivalent of an insider's direct ownership of stock. In support of this argument, she avers that there was no market for her unvested derivative securities, and she faced some uncertainty about her ability to realize a profit, because her options might never have vested (and, in fact, she did for-

feit a considerable portion of her unvested options when she left InfoSpace).

**[20]** Despite these characteristics, the SEC's interpretation that both vested and unvested securities are "purchased" when acquired governs treatment of Strom's options. Her arguments do not set her options apart from many run-of-the-mill employee-conferred securities plainly encompassed within the agency's general rule. Employment contracts often grant options that are nontransferable. And the SEC expressly stated in its 1991 Release that nontransferability does not warrant treating these securities differently from other options subject to the scope of § 16(b). *Id*. at 7251. The absence of a market for Strom's options, therefore, is of no import.

Likewise, while Strom's options were not guaranteed to vest, she would forfeit unvested options only if she voluntarily ceased to be an employee or was terminated for cause. Again, employee options are often so restricted, yet the SEC decided to treat them identically to non-restricted options, clarifying in the 1991 Release that securities are "purchased" when granted, even when "subject to risk of forfeiture." *Id*. at 7256. Thus, the SEC did not consider the uncertainty associated with unvested options pertinent.

**[21]** In sum, Strom's arguments do not undermine the SEC's interpretation that vested and unvested options are both "purchased" under § 16(b) when granted, not when they later vest. Strom does not contend that the SEC's interpretation is "plainly erroneous or inconsistent" with its regulations. With one possible caveat discussed below, we adopt the agency's stance. Strom therefore cannot establish based on the 1991 Release that she could have been subject to a § 16(b) suit with an objectively reasonable chance of success during the period pertinent to her tax liability.

**C**

As we have explained, the 1991 Release provided a definitive SEC interpretation that, under the rules governing

§ 16(b), the "purchase" of an unvested option occurs upon grant, not upon vesting. After the 1991 rulemaking, however, SEC staff suggested a narrow exception to that rule through a series of no-action letters addressing instruments granting options contingent on employees meeting performance targets. The no-action letters indicate that, so long as instruments are contingent on conditions other than the passage of time and continued employment, they will not be considered "derivative securit[ies]" until those conditions are satisfied. It would then follow that no "purchase" occurs under § 16(b) until the conditions are met and the instruments come to constitute "derivative securities."

The staff no-action letters' interpretation is based on the definition in SEC Rule 16a-1(c) of "derivative securities" as including "any option . . . with an exercise or conversion privilege at a price related to an equity security, or . . . a value derived from the value of an equity security." 17 C.F.R. § 240.16a-1(c). According to the staff letters, until the number of shares that an employee will be granted is fixed, the value of the instruments is not "derived from the value of" the underlying equity security. *See* Certilman Balin Adler & Hyman, SEC No-Action Letter, Fed. Sec. L. Rep. (CCH) ¶ 76,144, 1992 WL 82699, at *1 (April 20, 1992) (stating that where options conditioned the number of shares exercisable on earning targets, the options did not become "derivative securities" until those conditions were satisfied); *see also* Merrill Lynch & Co., Inc., SEC No-Action Letter, Fed. Sec. L. Rep. (CCH) ¶ 76,242, 1992 WL 210501 (Aug. 28, 1992); Boston Edison Co., SEC No-Action Letter, Fed. Sec. L. Rep. ¶ 76,128, 1992 WL 53789 (Mar. 19, 1992); Ford Motor Co., SEC No-Action Letter, Fed. Sec. L. Rep. (CCH) ¶ 79,724, 1991 WL 176852 (July 18, 1991).

In 1996, the SEC considered an amendment to the definition of "derivative security" to codify these staff interpretive positions. *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Release No. 21997,

62 S.E.C. Docket 138, 1996 WL 290234, at *14 & *14 n.102 (May 31, 1996) [hereinafter 1996 Release]. In the end, the SEC "endorse[d]" the staff's analysis but did not adopt it or codify it in the regulatory definitions. Rather, to retain flexibility, the agency indicated that future questions on conditional derivative securities should continue to be addressed to staff, while stating that "a condition will be considered 'material' only if it possesses substance independent of the passage of time or continued employment." *Id*. at *14.

For most of Strom's options, vesting was conditioned solely on elements the SEC declared not material—the passage of time and her continued employment. Thus, upon acquisition, a large majority of Strom's options undoubtably had a "value derived from the value of [the] equity security" according to the SEC's pronouncements, and so fit the SEC's definition of "derivative securities." 17 C.F.R. § 240.16a-1(c). These options therefore did not fit into the staff interpretive exception, and so were "purchased" under § 16(b) when granted.

Still, a small percentage of Strom's options did contain performance conditions. Those options, however, also did not fall within the class of instruments identified in the SEC no-action letters. The number of performance-contingent options that Strom could exercise on each date *was* fixed upon acquisition; satisfying the performance conditions simply *accelerated* the vesting dates of the options. Thus, putting aside the possibility of *early* vesting, her options would vest contingent only upon the passage of time and continued employment. They were therefore "derivative securities" when granted, and so also "purchased" under § 16(b) at that time.

We express no opinion on the staff administrative exception identified here. For our purposes, it is sufficient to note that Strom's options are not encompassed by the staff's interpretation. Thus, the general rule established in the 1991 Release that derivative securities are "purchased" under

§ 16(b) when acquired applies to Strom's options, no matter the validity of the staff's interpretation. Because Strom acquired her options in November 1998, the six-month window of potential § 16(b) liability ended in May 1999, before she exercised any options. As a result, Strom was not entitled to defer tax consequences from her exercises of options throughout 1999 and 2000 under IRC § 83(c)(3), because, had she sold stock during that period, she would not have been subject to a § 16(b) suit that had an objectively reasonable likelihood of success.

## D

Even so, Strom maintains that no caselaw definitively addresses whether unvested options are "purchased" when they vest, and so even if her theory is wrong, she still could have been subject to a § 16(b) suit with an objectively reasonable likelihood of success if she had sold her stock in 1999 and 2000. We disagree.

Strom is correct that no caselaw explicitly precludes her theory of securities law.[14] Of course, the SEC's interpretation

---

[14]Both parties identify caselaw supporting the proposition that the acquisition of a derivative security constitutes a "purchase" under § 16(b). Most of those cases provide no guidance on the issue of vesting—the characteristic disputed here—because they do not concern unvested options. *See Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321-322 (2d Cir. 1998) (holding that the SEC rules establish that the "*acquisition* of a fixed-price option—rather than its *exercise*—is the triggering event for Section 16(b) purposes"); *see also Gudmundsson v. United States*, 665 F. Supp. 2d 227, 236 (W.D.N.Y. 2009) (interpreting § 16(b) in the context of § 83(c)(3), and stating that the six-month period covered by § 16(b) is triggered by the "receipt of the derivative securities") *aff'd on different grounds*, ___ F.3d ___, 2011 WL 482467 (2d Cir. Feb. 11, 2011); *Donoghue v. Casual Male Retail Grp., Inc.*, 375 F. Supp. 2d 226, 236 (S.D.N.Y. 2005); *Tanner*, 117 T.C. at 238.

The options at issue in *Montgomery v. Commissioner*, 127 T.C. 43 (2006), were subject to a vesting schedule, *id.* at 46, and the court ulti-

of its regulations *does* preclude her theory, explaining, in part, the absence of caselaw on the issue.[15] The agency's reasonable interpretation is sufficient to determine that there was no realistic possibility that she would have been forced to forfeit property from the sale of stock in a § 16(b) suit.

The only case addressing the issue is not to the contrary. The court in *Dreiling v. America Online*, No. C05-1339JLR, 2005 WL 3299828 (W.D. Wash. Dec. 5, 2005), denied a motion to dismiss a § 16(b) suit premised on the theory that the vesting of options contingent upon performance targets constituted a "purchase" of those options. Citing an SEC staff

---

mately found that a purchase occurred on the last date the employee executed the option agreement, suggesting that neither the court nor the parties considered it pertinent that the options were unvested. *Id.* at 61. But the principal dispute in that case was whether the transactions were otherwise exempt from § 16(b) liability. *Id.* at 58-61. While the court also held that the six-month period ran from the date of grant, it never squarely addressed whether vesting could constitute a "purchase," nor is it apparent from the opinion whether the parties made such an argument.

[15]We pause to note another reason that caselaw addressing the issue is sparse: SEC rules routinely exempt from § 16(b) coverage transactions involving securities similar to Strom's options. Rule 16b-3, in particular, exempts various transactions between an issuer and its officers or directors. *See* 17 C.F.R. § 240.16b-3; *see also Dreiling*, 458 F.3d at 945 (discussing exemption for transactions with issuer); 1996 Release at *3 (expanding the exemptions provided in Rule 16b-3); 1 Harold S. Bloomenthal, SECURITIES LAW HANDBOOK § 14:7 ("Rule 16b-3, as revised in 1996, exempts from the short-swing profit provision *most transactions . . .* between the issuer, including an employee benefit plan sponsored by the issuer, and an officer or director." (emphasis added)). Indeed, in 1996 when the SEC declined to adopt the staff position that instruments are not within the scope of § 16(b) if they include "material non-market price based conditions (such as return on equity) to exercise or settlement," it did so in large part because it predicted that "in almost all cases [these instruments] will be exempt from § 16(b) . . . ." 1996 Release at *14. Here, for reasons not apparent to us, the government has not argued that Strom's transactions were exempt under Rule 16b-3 or under any other exemption from the prohibitions of § 16(b), so we do not address the exemption issue.

no-action letter articulating the exception for instruments conditioned on criteria other than the passage of time and continued employment, the court assumed without deciding that "the vesting dates have the possibility of triggering Section 16(b) liability as 'purchases.' "[16] *Id.* at *4.

Because the instruments in *Dreiling* were conditioned on performance criteria, it is plausible that, under the interpretive exception carved out by SEC staff, the instruments did not constitute derivative securities until the criteria were satisfied. The district court's willingness to assume that the vesting dates in that case could be sufficiently pertinent under § 16(b) to preclude dismissal under Rule 12(b)(6) does not support Strom's argument that the vesting of *her* unvested options— none of which fit into the SEC staff exception—constituted "purchases" under § 16(b).[17]

\* \* \*

[16]As far as we can tell, the parties didn't raise the vesting-as-purchase issue again in the course of the *Dreiling* litigation. The district court granted the defendant's motion for summary judgment on different grounds, without revisiting the vesting argument. *Dreiling v. Am. Online, Inc.*, No. C05-1339JLR, 2008 WL 496166 (W.D. Wash. Jan. 3, 2008), *aff'd*, *Dreiling v. Am. Online, Inc.*, 578 F.3d 995 (9th Cir. 2009).

[17]Strom argues that the *Dreiling* court's refusal to dismiss the vesting argument at the Rule 12(b)(6) stage is evidence that her legal theory is valid enough to have persuaded one court, and so should suffice to allow her to defer tax consequences under IRC § 83(c)(3). But aside from the crucial factual distinction, noted in the text, between that case and this one, *Dreiling* incorrectly applied the Rule 12(b)(6) standard by assuming but not deciding that the complaint stated a claim for relief. *See, e.g., Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (noting that cases are dismissable under Rule 12(b)(6) for "the lack of a cognizable legal theory"); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("The purpose of F. R. Civ. P. 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery."). As a result, the *Dreiling* court never actually accepted the legal theory advanced in that case.

**[22]** To summarize our holdings: Under the SEC's interpretation of its rules, the vesting of Strom's unvested options did not constitute "purchases" under § 16(b). Thus, she is not entitled to defer the tax consequences of her option exercises under IRC § 83(c)(3), because she has not demonstrated that she could have been subject to a § 16(b) suit that had an objectively reasonable chance of success had she sold her stock at a profit in 1999 or 2000. A reasonably prudent and legally sophisticated person in Strom's position would have felt free to sell her property, because, if a § 16(b) suit had been brought against her, she would not have been forced to forfeit the profit obtained by the sale, nor would she have faced substantial legal expenses defending herself in a suit not readily dismissable.

Should any of these holdings appear anomalous, it is because § 83(c)(3)'s incorporation into the tax code of § 16(b) makes for strange bedfellows. The statutory and regulatory structures and purposes of the tax law and the securities law are distinct. In Strom's case, the interaction of the two statutory schemes means that she was not exposed to a realistic threat of forfeiting profits during the period when she was able to exercise options (and thereby incur tax consequences), because the period of concern for § 16(b) purposes had passed by then. There was therefore no overlap between the period of potential § 16(b) liability and the period Strom could incur tax consequences due to the options. But that lack of overlap won't exist in many other instances—for example, where an employer grants vested options, or grants unvested options with a vesting schedule shorter than six months. So there is no anomaly, only an accommodation of two statutory schemes that turns out to have no impact on the facts of this particular case.

**[23]** Although the district court correctly rejected Strom's theory of securities law, it incorrectly applied the Rule 11 frivolousness standard under § 83(c)(3) in assessing the viability of a § 16(b) suit, and so held that she was entitled to

defer tax consequences attributable to her option exercises under § 83(c)(3). We therefore reverse the district court's grant of summary judgment in favor of Strom on this ground.

## III

### A

**[24]** To this point, our rulings prohibit Strom from deferring the recognition and valuation of income attributable to her option exercises in 1999 and 2000 under IRC § 83(c)(3). The final question we face is whether Strom could defer tax consequences for a distinct reason: Under Treasury Regulation § 1.83-3(k), Strom could defer the tax consequences of her option exercises if her property rights were subject to "restriction[s] on transfer to comply with the 'Pooling-of-Interests Accounting' rules." 26 C.F.R. § 1.83-3(k). Strom points to the three mergers in which InfoSpace engaged in 1999 and 2000, and arguing that her ability to sell stock was restricted for some months before and after each merger by an InfoSpace policy designed to comply with pooling-of-interests accounting rules. According to Strom, she is therefore entitled to defer the calculation and recognition of income during those restricted periods.

Before explaining the pooling-of-interests rules, we address a procedural issue. Because the district court held that Strom could defer recognition and valuation of her income from 1999 until December 23, 2000 based on § 83(c)(3), it did not decide whether pooling-of-interests restrictions *also* allowed her to defer tax consequences during that period. The district court's discussion of this distinct argument was limited only to whether pooling-of-interests restrictions allowed Strom *further* to defer tax consequences from December 23, 2000 into January 2001. Addressing that question, the district court concluded that the agency pooling-of-interests restrictions were not applicable during that short period. As will appear, we do not agree with the district court's legal analysis as applied to

that period or any other. We therefore reverse the district court on that issue. Having done so, we remand for the district court to apply the correct legal standard for the pooling-of-interests restrictions to the entire period at issue, 1999 to January 2001, now that income during that much longer period can no longer be sheltered under § 83(c)(3).

**B**

The district court held that the Treasury regulation allowing for deferral of tax consequences based on pooling-of-interests restrictions applies only when a policy limits the transferability of stock *after* a merger occurs. We do not agree with that conclusion.

**1**

The pooling-of-interests rules were a method of accounting for business mergers permitted during the tax years at issue for companies that met requirements set out in Accounting Principles Board Opinion No. 16. *See* Accounting for Business Combinations (1970) ("Opinion 16"), *superseded by* Statement of Financial Accounting Standards (SFAS) No. 141 (2001); *see also Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 156 n.4 (3d Cir. 1999) (describing the pooling-of-interests method). The pooling-of-interests rules required stockholders of both companies in a merger to share the risks of the combined entities. Risk-sharing was accomplished in part by restricting officers from trading in shares of their company during the merger process.

The SEC issued two releases, Releases No. 130 and 135, interpreting Opinion 16. *See* Accounting Series Release No. 130, 37 Fed. Reg. 20937 (Oct. 5, 1972) [hereinafter "Release No. 130"]; Accounting Series Release No. 135, 38 Fed. Reg. 1734 (Jan. 18, 1973) [hereinafter "Release No. 135"]. Release No. 130 noted an increasing number of mergers that *appeared* to satisfy the requirements for pooling-of-interests accounting

set forth in Opinion No. 16, "but which [did] not conform with the overriding thrust of that opinion," because the mergers did not include a sufficient "sharing of rights and risks among constituent stockholder[s]." Release No. 130. In an effort to avoid "form over substance" and retain flexibility in future cases, the SEC was careful to emphasize that there was no "formula" or "absolute rules" that would automatically qualify a merger for the pooling-of-interests rules. *Id.* Rather, Release No. 130 established general "guidelines" to assist companies contemplating business combinations. *Id.*

Shortly thereafter, the SEC issued Release No. 135 to clarify that, after a merger, companies should restrict their officers' transfers of stock until at least the publication date of financial results covering 30 days of post-merger activity. Specifically, Release No. 135 explained that the SEC would consider the pooling-of-interests accounting requirements to be satisfied "if no affiliate of either company in the business combination sells . . . any common shares received in the business combination until such time as financial results covering at least 30 days of post merger combined operations have been published."[18] Release No. 135.

A few years later, SEC staff issued a non-binding bulletin interpreting Releases 130 and 135 to mean that companies should also consider restricting their officers' ability to trade stock *before* the consummation of a merger. *See* Staff Accounting Bulletin No. 65, 36 SEC Docket 1193, 1986 WL 703851 (Nov. 5, 1986) [hereinafter "SAB No. 65"]. SEC staff stated that it would be "inconsistent" to allow affiliates to "sell their shares shortly before the consummation of [a] combination while restricting such sales immediately following

---

[18]Release No. 130 had previously articulated the more general rule that "all stock issued in a pooling must be held at risk at least as long as it takes to prepare post-merger financial statements for the combined entity and then to file and await effectiveness of a registration statement before it can be publicly sold." Release No. 130.

the exchange." *Id*. At the same time, the staff advised that it "will generally not raise a question about the applicability of pooling of interests accounting as a result of dispositions of shares by affiliates prior to 30 days before consummation of a business combination." *Id*.

These SEC materials established general guidelines regarding the pooling-of-interests rules. The principal inquiry remained whether the constituent stockholders sufficiently shared rights and risks during the merger. The agency provided *some* guidance regarding whether restrictions on the transfer of stock before and after mergers were consistent with the pooling-of-interests rules. But, aside from the rule articulated in Release No. 135—namely, that "pooling-of-interests accounting will have occurred if no affiliate" sells stock until publication of 30 days of post-merger financial results—the agency refrained from articulating absolute criteria establishing when the pooling-of-interests rules would be satisfied.

**2**

**[25]** For the tax purposes at issue here, property restricted in compliance with pooling-of-interests rules is "subject to substantial risk of forfeiture" and "not transferable":

> For purposes of section 83 and the regulations thereunder, property is subject to substantial risk of forfeiture and is not transferable so long as the property is subject to a restriction on transfer to comply with the "Pooling-of-Interests Accounting" rules set forth in Accounting Series Release Numbered 130 and . . . 135.

26 C.F.R. § 1.83-3(k).

**[26]** The district court noted that Treasury Regulation § 1.83-3(k) references only Release Nos. 130 and 135, and

that those releases only expressly recommend that companies restrict their officers' *post-merger* sales of stock (i.e., Release No. 135 explains that stock should not be transferred until after the publication of financial results covering 30 days of post-merger activity). The district court concluded that § 1.83-3(k) therefore must be limited *only* to restrictions on post-merger sales of stock, and that the regulation has no application to restrictions on officers' *pre-merger* sales of stock. The district court declined to consider the staff recommendations about pre-merger restrictions in SAB No. 65, because that bulletin is not referenced in the Treasury regulation.

**[27]** We cannot agree with this interpretation. The pertinent question under Treasury Regulation § 1.83-3(k) is whether property is subject to a restriction on transfer that complied with the pooling-of-interests rules set forth in Releases 130 and 135. Those releases were quite broad and disclaimed any intention to limit the applicability of the pooling-of-interests rules to business combinations on the basis of rigid criteria. In other words, so long as a combination represents a sharing of rights and risks among stockholders, the releases contemplate a range of methods for restricting officers' transfers of stock compatible with the pooling-of-interests method. Finally, while we recognize that SAB No. 65 is not binding, the staff recommendation that Releases No. 130 and 135 may require pre-merger restrictions supports our interpretation.

With those criteria in mind, we remand for further proceedings. Applying the principles we have enunciated will require factual inquiries not made by the district court because of the view it took on the § 83(c)(3) issue. For example, the parties dispute the terms and even the existence of an InfoSpace policy restricting Strom's transfer of stock during the pertinent period. Moreover, the precise dates of the purported restricted periods are not well-developed on the present record. Finally, the quite general standard we enunciate may require factual inquiries to determine whether any InfoSpace policy suffi-

ciently required constituent stockholders to share risks during the mergers to comply with the pooling-of-interests accounting rules. In the absence of any district court consideration of these fact-based inquiries, we do not decide whether there are triable issues of fact with regard to these issues or any other, although there may well be.

## Conclusion

[28] We hold that Strom could not invoke IRC § 83(c)(3) to defer the tax-consequences of her stock option exercises. As to deferral under Treasury Regulation § 1.83-3(k), we remand to the district court for further proceedings consistent with this opinion.

Each side shall bear its own costs on this appeal.

**REVERSED and REMANDED.**